

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-21-2003

# Nesbit v. Gears Unlimited Inc

Precedential or Non-Precedential: Precedential

Docket No. 01-1195

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Nesbit v. Gears Unlimited Inc" (2003). *2003 Decisions.* Paper 159.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/159

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 21, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 01-1195

————

NORMA J. NESBIT,
                              Appellant

v.

GEARS UNLIMITED, INC.

————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 99-cv-00655)
District Judge: Honorable Yvette Kane

————

Argued March 22, 2002

Before: NYGAARD, ROTH and AMBRO, *Circuit Judges*

(Opinion filed: October 21, 2003)

Donald A. Bailey, Esquire (*Argued*)
4311 North 6th Street
Harrisburg, PA 17110
*Attorney for Appellant*

John L. Senft, Esquire (*Argued*)
Barley, Snyder, Senft & Cohen
100 East Market Street
P.O. Box 15012
York, PA 17405
*Attorney for Appellee*

---

**OPINION OF THE COURT**

---

**AMBRO**, *Circuit Judge*:

Title VII of the Civil Rights Act of 1964 prohibits companies employing "fifteen or more" persons from discriminating on the basis of sex in hiring, discharge, compensation, or terms of employment. 42 U.S.C. §§ 2000e(b), 2000e-2(a)(1). Norma Nesbit alleges that Gears Unlimited, Inc. ("Gears") terminated her employment as a machine operator because of her sex. She concedes that Gears did not employ fifteen persons during the pertinent time period, but argues that we should also count the employees at a related entity, Winters Performance Products ("Winters"). Together, Gears and Winters had more than fifteen employees. We hold that the District Court properly refused to aggregate the number of employees at these companies. Because Title VII does not cover Gears by itself, we affirm the dismissal of Nesbit's complaint. But we part with the District Court on the path to this result. It viewed Title VII's "fifteen or more" person requirement as jurisdictional. We affirm the dismissal of Nesbit's complaint on the merits rather than for lack of subject matter jurisdiction.

## I. FACTS AND PROCEDURAL HISTORY

In 1973, Vaughn Winter, Sr. ("Vaughn Sr.") founded Winters, which manufactures "rear ends" for high-performance automobiles. In 1990, he acquired Gears, a transmission parts manufacturer. Vaughn Sr. and his wife, Madeline Winter ("Madeline"), also formed Maverick Industries, Inc. ("Maverick"), which warehouses automotive parts, including parts produced at Winters. At the time of the events relating to this suit — December 1994 through August 1997 — Vaughn Sr. had a stake in three automotive companies: Gears, Winters, and Maverick.

The Winter family shares ownership and control of these three companies. Vaughn Sr. owns ten percent of Gears, with the remainder held in trust in equal shares for his

children — Nina and Vaughn Jr. Vaughn Sr. is president of Gears and his children are corporate officers. He and Madeline own Winters and Maverick in equal shares. He is president of Winters and Maverick, and Madeline is the Secretary/Treasurer at Winters.

Gears and Winters occupy separate plants about one mile apart in York, Pennsylvania. In almost all respects, they operate independently. Their products are distinct — Gears produces transmissions and Winters produces automotive rear ends — and each company has its own equipment and production lines. Winters contracts to buy parts from Gears at market rates. The companies maintain separate financial records and payrolls, write separate checks, and file separate tax returns.

Vaughn Sr. monitors operations at both Gears and Winters. While he participates in day-to-day management at Winters, Gears is managed by Randy Lau. Vaughn Sr. testified that he visits the Gears facility only about twice a month, usually because a machine has broken down. Nesbit disputes this testimony, contending that Vaughn Sr. spends time at Gears "pretty much every day."

The only area in which Gears and Winters cooperate considerably is in hiring. Typically, if either Gears or Winters has an opening, a Winters employee will place a "help wanted" sign on the street in front of the Winters building. Prospective employees obtain applications at the Winters front office and return them there as well. If Winters is hiring, either Vaughn Sr. or his wife will invite qualified applicants for an interview. If Gears has an opening, someone at Winters will communicate with the applicant on Lau's behalf and then direct him or her to the Gears plant to interview with Lau. The hiring decision is then Lau's "prerogative." However, Vaughn Sr. (who, as noted above, normally does not participate in Gears management) can request that Gears hire a particular applicant and Gears will generally do so. Either Lau or the Winter children normally decide whether to terminate an employee, but Vaughn Sr. testified that he could ask Gears to fire an employee who engaged in significant misconduct.

On December 14, 1994, Nesbit submitted a standard

employment application to Winters for a machine operator position. That day, either Vaughn Sr. or Madeline interviewed her.[1] The interviewer concluded that no available positions at Winters would be suitable for Nesbit and instead referred her to Gears, which hired her as a machine operator.[2] Vaughn Sr. personally accompanied Nesbit to meet Lau, but the parties dispute whether Vaughn Sr. or Lau actually made the hiring decision.

Nesbit remained at Gears for two years and eight months. She perceived that Lau was her "boss" and was "more or less in charge" at Gears. Occasionally she also worked an extra shift at Winters following her regular shift at Gears. She would punch out on the time clock at Gears and then punch in at Winters. When working a Winters shift, she received a separate paycheck. Her hours at the two plants were not consolidated for overtime pay.

On August 19, 1997, Nesbit's machine at Gears "crashed," leaving it unusable without repairs. Nesbit became upset, which apparently caused her to develop a headache and neck pains. She informed the acting supervisor, Greg Pell, that she was leaving work to visit her chiropractor. When she returned the next day, Lau was on vacation, and Vaughn Sr. discharged her for insubordination.

After receiving permission from the Equal Employment Opportunity Commission, Nesbit filed suit in the United States District Court for the Middle District of Pennsylvania alleging that Gears discriminated against her because of gender. Gears moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction on the basis that it employed fewer than fifteen persons during the relevant time period and therefore was not an "employer" subject to Title VII.

Nesbit then filed an amended complaint alleging that

---

1. The parties dispute whether Vaughn Sr. or Madeline conducted the initial interview, though it is not important for our analysis.

2. Nesbit is plaintiff's maiden name and the name she uses in this litigation. The name on her employment application and in Gears' employment records is Norma J. Tran.

Gears and its "associate corporation" Winters Transmission, Inc. — a company different from Winters that Vaughn Sr. owned from 1955 to 1985 — were really a single employer with more than fifteen employees. Gears moved again for a dismissal, this time observing that the entity called "Winters Transmission, Inc." had ceased operation long before Nesbit began working at Gears. Nesbit then filed a second amended complaint, alleging that Gears and Winters are associate corporations that together meet the fifteen-employee threshold. On the basis of that allegation, the District Court ordered discovery limited to the question whether Gears and Winters constitute a single employer under Title VII. Following discovery, the District Court issued a memorandum and order in which it concluded that Gears and Winters are separate entities and, because Gears unquestionably employs fewer than fifteen persons by itself, dismissed Nesbit's complaint for lack of subject matter jurisdiction. This appeal followed.

## II. DISCUSSION

### A. Is the Number of Employees a Jurisdictional Requirement?

We first address whether Title VII's fifteen-employee threshold is a jurisdictional prerequisite — as the District Court believed it was in dismissing Nesbit's complaint pursuant to Rule 12(b)(1) — or whether it is a substantive element of a Title VII claim. Whether an aspect of a claim concerns subject matter jurisdiction or the merits has at least three implications. First, because subject matter jurisdiction is non-waivable, courts have an independent obligation to satisfy themselves of jurisdiction if it is in doubt. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977). A necessary corollary is that the court can raise *sua sponte* subject-matter jurisdiction concerns. Second, if the fifteen-employee requirement is not jurisdictional, a Title VII claim for which the number of employees is in doubt nonetheless will support supplemental jurisdiction under 28 U.S.C. § 1367 over state claims. *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 362 & 365 (2d Cir. 2000); 13B Wright, Miller & Cooper, *Federal Practice and Procedure* § 3564, at 73-5 (2d ed. 1984). Third,

in most contexts the question will be important to the plaintiff's burden of proof. If an aspect of a claim concerns jurisdiction, and when jurisdiction turns on whether a particular fact is true as here (as opposed to whether the complaint sufficiently alleges jurisdiction on its face), a court may inquire into the jurisdictional facts without viewing the evidence in a light favorable to either party. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). By contrast, if an aspect of a claim concerns the merits, on a Rule 12(b)(6) motion to dismiss for failure to state a claim a court must accept the complaint's allegations as true, *United States Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002); on a Rule 56 motion for summary judgment it must view the evidence in the light most favorable to the non-moving party and, if there are disputes over genuine issues of material fact, they are for the jury to resolve, *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001).

### 1. Relevant Caselaw

The question whether Title VII's fifteen-employee threshold is a jurisdictional prerequisite when a plaintiff brings a colorable Title VII claim has divided the courts of appeals.[3] The Second and Seventh Circuits conclude that it is a substantive element that the plaintiff must prove unless the claim that there are fifteen employees is so obviously unfounded that it fails to raise a genuine federal controversy. *Da Silva*, 229 F.3d at 364-65 (2d Cir.);

---

3. In *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202 (1997), the Supreme Court granted *certiorari* to decide whether the Seventh Circuit erred in dismissing a Title VII suit for lack of subject matter jurisdiction because the defendant company lacked fifteen employees during the relevant period. The Court reversed and remanded, concluding that the Seventh Circuit had erred in determining the number of employees, but did not address whether the fifteen-employee requirement is jurisdictional or an element of the merits. *Id.* at 212.

Moreover, in *Hishon v. King & Spalding*, 467 U.S. 69 (1984), the Supreme Court found it "unnecessary to consider the District Court's invocation of Rule 12(b)(1) [lack of subject matter jurisdiction], as opposed to Rule 12(b)(6) [failure to state a claim]" on a similar issue — whether "Title VII [is applicable] to the selection of partners by a partnership." *Id.* at 72-73 & n.2.

*Johnson v. Apna Ghar, Inc.*, 330 F.3d 999, 1001-02 (7th Cir. 2003), *petition for cert. filed*, 72 U.S.L.W. 3021 (U.S. Sept. 2, 2003) (No. 03-354); *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 943 (7th Cir. 1999); *Sharpe v. Jefferson Distrib. Co.*, 148 F.3d 676, 677-678 (7th Cir. 1998). Moreover, the D.C. Circuit has held the Americans with Disabilities Act's ("ADA") fifteen-employee threshold an element of the merits. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 623-25 (D.C. Cir. 1997). In this context, the ADA's fifteen-employee requirement is in all relevant respects indistinguishable from Title VII's.

By contrast, the Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits have said that the fifteen-employee threshold is jurisdictional. *Greenless v. Eidenmuller Enters., Inc.*, 32 F.3d 197, 198 (5th Cir. 1994); *Armbuster v. Quinn*, 711 F.2d 1332, 1335 (6th Cir. 1983); *Childs v. Local 18, IBEW*, 719 F.2d 1379, 1382 (9th Cir. 1983); *Owens v. Rush*, 636 F.2d 283, 287 (10th Cir. 1980);[4] *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999). Moreover, in *Thurber v. Jack Reilly's, Inc.*, 717 F.2d 633 (1st Cir. 1983), the First Circuit upheld a district court's dismissal of a Title VII case for lack of subject matter jurisdiction (although the basis for the District Court's dismissal in *Thurber* — lack of jurisdiction or the merits — was uncontested; at issue was the number of employees the employer had). The Fourth Circuit also held that the number of employees is jurisdictional in a case brought under the Family and Medical Leave Act ("FMLA"), a holding that suggests it would deem the number of employees jurisdictional in the Title VII context as well. *See Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir. 1999) ("A district court lacks subject matter jurisdiction over an FMLA claim if the defendant is not an employer as that term is defined in the FMLA [which defines an employer as "any person . . . who employs 50 or more employees.]").

The division is deeper than merely inter-circuit. Even

---

4. Likewise, in *Trainor v. Apollo Metal Specialties*, 318 F.3d 976, 978 n.2 (10th Cir. 2003), the Tenth Circuit held that whether an employer employs fifteen people is a jurisdictional question in a case brought under the ADA.

within certain circuits that have held Title VII's fifteen-employee threshold jurisdictional, there is conflict. While in *Owens* the Tenth Circuit assumed (without analysis) that the requirement is jurisdictional, in *Wheeler v. Hurdman,* 825 F.2d 257 (10th Cir. 1987), that Court held that the fifteen-employee threshold is both jurisdictional and "intertwined with the merits of the case," and therefore should have been resolved as if on the merits. *Id.* at 259.

The Eleventh Circuit is similarly conflicted. In *Garcia v. Copenhaver, Bell & Associates, M.D.'s, P.A.,* 104 F.3d 1256 (11th Cir. 1997), the Court opined that the Age Discrimination in Employment Act's twenty-employee threshold "goes to the merits of an ADEA case." *Id.* at 1258. It reasoned that "the section of the ADEA that provides the substantive relief" — the section forbidding an employer from discriminating — "is intertwined and dependent on the section of the ADEA that defines the scope of the act" — the section defining "employer" as one who employs more than twenty employees. *Id.* at 1263. However, in a later case, *Scarfo,* 175 F.3d 957, the Eleventh Circuit dismissed a plaintiff's Title VII claim for lack of subject matter jurisdiction when the defendant fell short of fifteen employees. A third case, *Morrison v. Amway Corp.,* 323 F.3d 920 (11th Cir. 2003), recognized this intra-circuit conflict and essentially joined both camps. It stated that, in the FMLA context, a fifty-employee threshold "implicate[s] *both* jurisdiction and the underlying merits." *Id.* at 929 (emphasis added). However, it held that *Garcia* correctly disposed of the issue as a matter of procedure: "the district court was required to find that jurisdiction exists and deal with the objection as a direct attack on the merits of plaintiff's case" because of the degree to which the jurisdictional and merits inquiries were intertwined. *Id.* at 929-30 (internal quotation marks omitted).[5]

---

5. Moreover, all the circuits that have held the fifteen-employee threshold jurisdictional have also stated — in the same case or in other cases — that "where the jurisdictional facts are intertwined with the facts central to the merits of the dispute[,] [i]t is the better view that . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *see Clark v. Tarrant County, Texas*, 798 F.2d 736, 741-42 (5th Cir. 1986); *Gould,*

### *2. Title VII's Fifteen-Employee Requirement is an Element of the Merits*

With this conflict in mind, we begin our determination by noting that subject matter jurisdiction is the "courts' statutory or constitutional *power* to adjudicate" particular cases. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in original). *Steel Co.* requires that courts normally should not conflate subject matter jurisdiction with elements of an action's merits. The Supreme Court held that the elements of another federal statute — the Emergency Planning and Community Right-To-Know Act of 1986 ("EPCRA"), 42 U.S.C. § 11046(a)(1) — are not jurisdictional prerequisites. *Steel Co.*, 523 U.S. at 90-93. In relevant part, EPCRA requires users of specified hazardous chemicals to file annual reports detailing their chemical inventories, waste-disposal methods, and recent releases of chemicals from their facilities into the environment, and provides that the "district courts shall have jurisdiction in actions brought under subsection (a) of this section against an owner or operator of a facility to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement." 42 U.S.C. § 11046(c). The *Steel Co.* plaintiff, a group to protect environmental rights, sued a Chicago manufacturer and asserted past violations of EPCRA. After being notified that it was in arrears on its filings, the manufacturer filed all the overdue reports. The plaintiff nonetheless continued its suit, seeking relief for past reporting violations.

The District Court concluded that EPCRA does not support suits for past violations and therefore dismissed the plaintiff's complaint under both Rules 12(b)(1) and 12(b)(6). The Court of Appeals for the Fourth Circuit reversed, holding that EPCRA permits such suits. The Supreme Court determined that the case raised (1) whether

---

*Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 451 (6th Cir. 1988); *Timberlane v. Bank of Am.*, 749 F.2d 1378, 1381 (9th Cir. 1984), *overruled on other grounds by Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993); *Wheeler v. Hurdman*, 825 F.2d at 259; *Morrison v. Amway Corp.*, 323 F.3d at 929. These cases highlight the unsettled nature of the merits/jurisdictional question.

the plaintiff had constitutional standing and (2) whether allegations of past violations state a cause of action under EPCRA, *Steel Co.*, 523 U.S. at 88. As to the latter, the Court decided that the past violations question was on the merits and not a jurisdictional requirement. *Id.* at 110. In so doing, *Steel Co.* rejected attempts to portray the requirement to prove all elements of a cause of action as relevant to federal courts' jurisdiction to hear a suit. The Court reasoned that "[i]t is firmly established in our cases that absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction." *Id.* at 89. On the contrary,

> '[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.' Rather, the district court has jurisdiction if 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another . . . .'

*Id.* at 89 (quoting *Bell v. Hood*, 327 U.S. 678, 685 (1946)).

The Court also criticized the implications of treating the validity of a cause of action as jurisdictional. *Id.* at 92-93. Under that approach, each element of every cause of action would have a legitimate claim to being a jurisdictional requirement — essentially eviscerating the distinction between the jurisdictional and merits inquiry (and requiring a court to dismiss a claim for lack of jurisdiction whenever the plaintiff does not prevail). The Court made plain, however, that subject matter jurisdiction *is* lacking if the alleged basis for jurisdiction "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial or frivolous." *Id.* at 89.

We presaged *Steel Co.* in a case decided five years earlier. In *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1280-81 (3d Cir. 1993), the District Court dismissed a claim under the Fair Housing Act for lack of subject matter jurisdiction. The Fair Housing Act makes it unlawful, *inter alia,* "[t]o discriminate in the sale or rental,

or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). The District Court concluded that the defendant did not "make unavailable or deny" housing to the plaintiff and that the Fair Housing Act was therefore not implicated. We reversed, holding that "[a] district court has federal question jurisdiction in any case where a plaintiff with standing makes a non-frivolous allegation that he or she is entitled to relief because the defendant's conduct violated a federal statute." *Growth Horizons*, 983 F.2d at 1281. We further explained that "[d]ismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Id.* at 1280-81 (citing *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 899 (3d Cir. 1987) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666 (1974))); *see also* 2 Moore's Federal Practice § 12.30[1], at 12-36 (3d ed. 2000) ("Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as a predicate for relief — a merits-related determination.").[6]

---

6. The Restatement (Second) of Judgments: Subject Matter Jurisdiction § 11 (1982) also addresses the question whether an issue affects subject matter jurisdiction or the merits, ultimately concluding that there is no principled way to distinguish between the two. It notes that "[t]here is a strong tendency in procedural law to treat various kinds of serious procedural errors as defects in subject matter jurisdiction . . . because characterizing a court's departure in exercising authority as 'jurisdictional' permits an objection to the departure to be taken belatedly." Restatement (Second) of Judgments: Subject Matter Jurisdiction § 11 cmt. e. Relevant to the question here, it goes on to note that

> [t]he difficult problems are encountered when the issues on which the court's subject matter jurisdiction depends are not so clearcut. [For example,] if the court has jurisdiction of actions of more than a specified amount, there can be uncertainty in whether a particular claim exceeds that amount. The problem can be particularly difficult

12

Turning to Title VII, we note that those courts that have held the fifteen-employee requirement jurisdictional have provided no reasons for their holding; rather, they have assumed it so or stated the conclusion without meaningful analysis. Moreover, in reading 42 U.S.C. § 2000e(b) we perceive no congressional intent to make the requirement jurisdictional. Indeed, Title VII contains an explicit jurisdictional section, § 2000e-5(f)(3), which provides that "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter." By contrast, § 2000e(b) — in which the fifteen-employee requirement appears — is a definitional section, defining "employer." We doubt that Congress intended this definitional section to have subject matter jurisdictional import. If Congress had so intended, we believe its intention would be clearer. Notably, § 2000e(b) does not even contain the word "jurisdiction." *Compare* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); *id.* § 1332 (explicitly making diverse citizenship and a $75,000 amount-in-controversy jurisdictional prerequisites). Moreover, congressional debate (albeit postdating the requirement that an "employer" have more than fifteen employees) reveals that at least some legislators regard the fifteen-employee minimum not as jurisdictional but as an element of the cause of action. *See* 137 Cong. Rec. H9505-01 (Daily ed. Nov. 7, 1991) (statement of Rep. Brooks) ("[W]hen a company has less than 15 employees, there are no damages available whatsoever because there is no cause of action under our current antidiscrimination statutes.").

---

when the issue determining subject matter jurisdiction parallels an issue going to the merits.

*Id.* In those cases the Restatement concludes that "the matter in question can plausibly be characterized either as going to subject matter jurisdiction or as being one of merits or procedure." *Id.*

### 3. Most Plausible Arguments for Making Fifteen-Employee Requirement Jurisdictional

#### a. Commerce Clause Argument

Perhaps the most plausible reason for finding that the fifteen-employee requirement is jurisdictional is that it concerns a "dispute[ ] as to the existence of a fact that is essential to a constitutional exercise of Congress's power to regulate." *Da Silva*, 229 F.3d at 363 (suggesting this as a situation "[l]ess clearly placed on one side of the jurisdiction/merits line"). As discussed, Title VII applies to "employers" and defines an "employer" (in relevant part) as "a person engaged in an industry affecting commerce who has fifteen or more employees." 42 U.S.C. § 2000e(b). Because Congress enacted Title VII under its Commerce Clause power, *EEOC v. Ratliff*, 906 F.2d 1314, 1315-16 (9th Cir. 1990), the requirement that an employer be "in an industry affecting commerce" is the statute's constitutional basis. And because the requirements that the employer be "in an industry affecting commerce" and that the employer have "fifteen or more employees" appear side by side in the statute, it is arguably reasonable to read § 2000e(b)'s "fifteen employee" minimum as relevant to Title VII's Commerce Clause basis as well. That is, one might read the fifteen-employee threshold as reflecting Congress's determination that only those companies with fifteen or more employees have the requisite substantial effect on interstate commerce to permit Congress to enact the statute. *See Legislative History of Titles VII and XI of Civil Rights Act of 1964*, at 2108 (1964) ("The bill proceeds upon a theory . . . that the quantum of employees is a rational yardstick by which the interstate commerce concept can be measured.") (separate minority views of Reps. Poff and Cramer, Members, House Comm. on the Judiciary); *cf. Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 311 (6th Cir. 1991) (noting "Congress's determination in Title VII that any employer with 15 or more employees necessarily implicates interstate commerce"); *Ratliff*, 906 F.2d at 1317 ("[I]t is difficult to imagine any activity, business or industry employing 15 or more employees that would not in some degree affect commerce among the states.") (quoting A.

Larson & L.K. Larson, *Employment Discrimination* § 5.31, at 2-40 (1987)).

This argument, while well-made, nonetheless is unconvincing. First, the very wording of 42 U.S.C. § 2000e(b) suggests that the requirements that an employer be "in an industry affecting commerce" and have "fifteen or more employees" are separate and independent, and that it is a mistake to conflate the two. Even if a putative employer has twenty employees, it is not covered by Title VII if not in an industry affecting commerce. Second, while the preceding Commerce Clause-based justification for Title VII's fifteen-employee requirement makes intuitive sense, it finds little support in the legislative history. We note that the 1972 amendments to Title VII lowered the minimum number of employees from twenty-five to fifteen. Patricia Davidson, Comment, *The Definition of "Employee" Under Title VII: Distinguishing Between Employees and Independent Contractors*, 53 U. Cin. L. Rev. 203, 206 (1984) (noting this change). It lacks logic that, pre-1972, Congress believed that it took twenty-five employees for a substantial effect on interstate commerce but changed its mind in 1972. Furthermore, as initially proposed, the 1972 amendment to Title VII contained an eight-employee threshold. *See Armbruster*, 711 F.2d at 1337 n.4. The threshold was ultimately raised to fifteen employees as the result of a political compromise, *see id.*, in order (among other reasons) "to protect ethnic businesses and small businesses." Davidson, *supra*, at 206 & n.23. Thus, the fifteen-employee threshold appears motivated by policy — to spare small companies the expense of complying with Title VII — rather than Commerce Clause considerations.

Even assuming that Congress lacks authority to enact a statute does not mean that a federal court lacks jurisdiction to review actions brought under that statute. When disposing of a claim brought under an unconstitutional statute, courts ordinarily deny the claim on the merits, on the ground that the statute under which relief is sought is unconstitutional, rather than for lack of subject matter jurisdiction. *Martin v. United Way of Erie County*, 829 F.2d 445, 447 (3d Cir. 1987); *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895 (3d Cir. 1987)

(noting the difference between congressional jurisdiction and federal courts' Article III jurisdiction, and concluding that "[e]lements of a claim that are called jurisdictional because they relate to Congress's jurisdiction remain questions of the merits"); *see also Plaut v. Spendthrift Farm, Inc.*, 789 F. Supp. 231 (E.D. Ky. 1992), *aff'd*, 1 F.3d 1487 (6th Cir. 1993), *aff'd*, 514 U.S. 211 (1995).

b. *Jurisdictional Statements in Other Supreme Court Cases*

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991), can be read to suggest that the fifteen-employee requirement is jurisdictional. In that case, the Supreme Court decided whether Title VII "applies extraterritorially to regulate the employment practices of United States employers who employ United States citizens abroad." *Id.* at 246. The Court addressed the question not as whether Title VII granted plaintiffs a cause of action for extraterritorial violations, but rather whether Title VII granted extraterritorial jurisdiction, *see id.* at 250, and affirmed the dismissal of the complaint for lack of jurisdiction. *Id.* at 259. In *Arabian American Oil Co.*, however, a policy consideration — namely, the significant effect extraterritorial application of U.S. law might have on international relations — favored viewing the extraterritoriality question as one of jurisdiction. That is, even if parties did not raise the question of Title VII's extraterritorial application, Congress would likely have intended courts to raise the issue *sua sponte* in the interest of harmonious international relations. Such concerns of international comity are not present here.

By analogy, some may find *EEOC v. Commercial Office Products Co.*, 486 U.S. 107 (1988), to counsel for finding jurisdictional the fifteen-employee requirement. In that case, the Supreme Court stated that "Title VII does not give the EEOC jurisdiction to enforce the Act against employers of fewer that 15 employees." *Id.* at 119 n.5. But this does not address the question before us. Title VII grants the EEOC power "to prevent any person from engaging in any unlawful employment practice." 42 U.S.C. § 2000e-5(a). Thus, if an entity (a "person" under the statute) employs

fewer than fifteen employees, by § 2000e-5(a)'s terms, the *EEOC* lacks power (jurisdiction). By contrast, Title VII's jurisdictional grant to the *federal courts* is broader. *See id.* § 2000e-5(f)(3) ("Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter.").

4. *Judicial Administration Reasons for Fifteen-Employee Requirement Being an Element of a Title VII Claim rather than a Jurisdictional Requirement*

As a policy matter — which is ultimately the gut of our inquiry — it also makes little sense to regard the fifteen-employee threshold as jurisdictional. Such a holding would require a federal court to determine whether a company had fifteen employees during the relevant period, even if the parties so stipulated. To require a federal court to engage in such a fact-intensive inquiry *sua sponte* — which might in some cases require a federal appellate court to dig through an extensive record, including pay stubs and time sheets — appears to be a waste of scarce judicial resources, and we doubt that Congress intended such a result. *See Da Silva*, 229 F.3d at 365 ("[I]nstitutional requirements of a judicial system weigh in favor of narrowing the number of facts or circumstances that determine subject matter jurisdiction."); *Sharpe*, 148 F.3d at 678 ("Surely the number of employees is not the sort of question a court (including appellate court) must raise on its own . . . .").

To hold the requirement jurisdictional also implies that a court would need to decide whether an entity employed more than fifteen individuals before reaching a Title VII action's merits — even if the merits were more easily resolved than the "jurisdictional" question. *Steel Co.*, 523 U.S. at 94-95. This result too is undesirable.

\* \* \* \* \* \* \* \* \*

In this context, we hold that, while the matter is not free from doubt, the fifteen-employee threshold is a substantive element (whether an "employer" exists) of a Title VII claim and is not jurisdictional. Federal jurisdiction is implicated only when the Title VII claim "clearly appears to be immaterial and made solely for the purpose of obtaining

jurisdiction or where such a claim is wholly insubstantial or frivolous," *Steel Co.*, 523 U.S. at 89, neither of which is the case here.

## B. Should We Consolidate the Number of Employees at Gears and Winters?

As the District Court looked beyond Nesbit's complaint and reviewed discovery on whether Gears employs more than fifteen people, it should have resolved the issue under the summary judgment standard rather than as a motion for judgment on the pleadings. Fed. R. Civ. P. 12(c). Nonetheless, we may affirm its disposition for any reason supported by the record. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109 (3d Cir. 2002). Though the District Court analyzed this case as jurisdictional rather than on the merits, Nesbit fails nonetheless. Gears and Winters are plainly separate entities that cannot be consolidated to meet the fifteen-employee threshold.

### 1. The National Labor Relations Board's "Integrated Enterprise" Test

Several courts of appeals have borrowed a four-part test — commonly called the "integrated enterprise" test or the "single employer" test — from the National Labor Relations Board ("NLRB") to determine when two nominally distinct companies should be treated as a single entity under Title VII. *See Anderson v. Pacific Maritime Association*, 336 F.3d 924, 929 (9th Cir. 2003); *RC Aluminum Industries, Inc. v. National Labor Relations Board*, 326 F.3d 235, 239 (D.C. Cir. 2003); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000); *Artis v. Francis Howell North Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1184 (8th Cir. 1998); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993); *McKenzie*, 834 F.2d at 933; *Childs*, 719 F.2d at 1382-83; *Armbruster*, 711 F.2d at 1336-38; *Trevino v. Celanese Corp.*, 701 F.2d 397, 403-04 (5th Cir. 1983). The four factors of the NLRB test are "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control." *Artis*, 161 F.3d at 1184 (citation omitted); *see also NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d. 1117, 1122 (3d Cir. 1982) (discussing the test in the labor

context). Among these factors, "[n]o single factor is dispositive; rather, single employer status under this test 'ultimately depends on all the circumstances of the case.'" *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 486 (3d Cir. 2001) (describing but not adopting the test in a case applying the Worker Adjustment Retraining Notification Act) (citation omitted). "[T]he heart of the inquiry is whether there is an absence of an arm's-length relationship among the companies." *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1184 (10th Cir. 1999) (citations omitted); *Browning-Ferris*, 691 F.2d at 1122. Moreover, "[c]ourts applying this four-part standard in Title VII and related cases have focused on the second factor: centralized control of labor relations." *Trevino*, 701 F.2d at 404.

The Seventh Circuit has rejected the NLRB's four-factor test as unhelpful in the anti-discrimination context. *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 942-43 (7th Cir. 1999). In addition, other courts have occasionally listed, but essentially ignored, the NLRB factors in Title VII cases, focusing instead on which entity actually made the allegedly discriminatory employment decision. *See, e.g.*, *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 777 (5th Cir. 1997); *see also* Marc Crandley, Note, *The Failure of the Integrated Enterprise Test: Why Courts Need to Find New Answers to the Multiple-Employer Puzzle in Federal Discrimination Cases*, 75 Ind. L.J. 1041, 1059-71 (2000) (arguing against application of the NLRB test in the Title VII context and presenting alternative options).

As the National Labor Relations Act ("NLRA") and Title VII address aspects of employer-employee relations, there is surface appeal to applying the NLRB's test in the Title VII context. But given the different policies animating the two statutes, the NLRB test does not self-steer to the Title VII context. That test is designed to determine whether the NLRB may decide a particular labor dispute. *UA Local 343 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, AFL-CIO v. Nor-Cal Plumbing, Inc.* 48 F.3d 1465, 1470 (9th Cir. 1994) ("[I]f the NLRB finds that [two firms] constitute a single unit . . . the collective bargaining agreement with the union firm [may] be extended to the non-union firm."); Crandley, *supra*, at

1064-65; *see also Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996) (describing the test's purpose to be "to protect the collective bargaining rights of employees and to advance industrial stability"). If the company at issue satisfies the NLRB test, it will in many cases be required to submit to collective bargaining. Crandley, *supra*, at 1064. But if a defendant in a Title VII suit is deemed an "employer" within the meaning of the statute, it may be subject to liability.

Because the NLRA and Title VII ask whether entities are a single enterprise for different reasons, it does not follow that the NLRB's test is any more relevant to Title VII cases than any of the other tests for determining whether two companies should be regarded as one. To the contrary, for purposes of determining whether two companies are a single employer, the NLRA's policy goals point in a different direction than Title VII's. As discussed, a significant purpose of the fifteen-employee minimum in the Title VII context is to spare small companies the considerable expense of complying with the statute's many-nuanced requirements. *See Papa*, 166 F.3d at 940; *Armbruster*, 711 F.2d at 1337 n.4 (reviewing the legislative history behind the fifteen-employee minimum). This goal suggests that the fifteen-employee minimum should be strictly construed. By contrast, the NLRB's jurisdiction was intended to be expansive, suggesting a more lenient test for labor cases. *See* Crandley, *supra*, at 1065-66. Thus we deem there is little reason to refer to the NLRB's test in deciding whether two entities should together be considered an "employer" for Title VII purposes. We instead adopt a different framework, tailored to Title VII's policy goals.

*2. Our Framework*

In *Papa*, the Seventh Circuit developed its own test to determine whether two nominally distinct entities should be considered as one for Title VII purposes. The Court began with the "basic principle of affiliate liability[,] . . . that an affiliate forfeits its limited liability only if it *acts* to forfeit it." *Id.* at 941 (emphasis in original). It proceeded to find three situations in the Title VII context when a company and its affiliates forfeit limited liability and thus are deemed a single employer: (1) where a company has split itself into entities with less than fifteen employees with the intent to

evade Title VII's reach; (2) when a parent company has directed the subsidiary's discriminatory act of which the plaintiff is complaining; or (3) when a court would otherwise pierce the corporate veil (*i.e.*, look behind the corporate form to hold a corporation's shareholders personally liable). *Id.* at 940-41.

We too will consider a company and its affiliates a single employer under Title VII (1) when a company has split itself into entities with less than fifteen employees intending to evade Title VII's reach or (2) when a parent company has directed the subsidiary's discriminatory act of which the plaintiff is complaining. However, on the third part of this disjunctive test, we articulate a slightly different standard from the Seventh Circuit. Rather than applying the test for veil piercing imported from the corporation law context (because individual shareholder liability is not implicated here), we will apply the factors courts use to determine when substantively to consolidate two or more entities in the bankruptcy context. When courts substantively consolidate two entities, they treat the assets and liabilities of each as belonging to a single entity. We explain in further detail each test.

a. *Splitting a Single Company into Two or More to Evade Title VII*

When a plaintiff proves that a company has split itself into multiple entities to evade coverage under Title VII, we consider those entities a single company for purposes of meeting the fifteen-employee threshold. "The privilege of separate incorporation is not intended to allow enterprises to duck their statutory duties." *Id.* at 941.

A plaintiff need not prove that evading Title VII was the *only* reason that a business split itself into multiple entities. Rather, it must make a *prima facie* case that this was a substantial motivating factor, after which the burden will shift to the defendant to produce evidence rebutting the plaintiff's proof. Relevant to a *prima facie* case are considerations such as (1) lack of a reasonable business justification, (2) whether the business split was one that, as an operational matter, would more sensibly be contained

within a single business entity (*e.g.*, the two companies make the same product or inputs for the same product), and (3) statements from those familiar with the industry suggesting that the company was split into multiple entities to evade Title VII.

### b. *Parent Directing Subsidiary's Act*

When the companies sought to be aggregated for Title VII purposes are in a parent-subsidiary relationship, we shall deem a parent and subsidiary a single employer when the parent has directed the subsidiary to perform the allegedly discriminatory act in question. By directing such an act, the parent disregards the separate corporate existence of the subsidiary and thus forfeits the right to be treated as a separate entity for Title VII purposes. Moreover, in such a situation the parent itself has committed the act in question and thus should share responsibility with the subsidiary. *See Papa*, 166 F.3d at 941.

### c. *Substantive Consolidation*

Absent either of the first two situations, we shall look to the factors courts use in deciding whether substantively to consolidate two or more entities in the bankruptcy context. While these factors vary from circuit to circuit, the test at base seeks to determine whether two or more entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice. More colloquially, the question is whether the "eggs" — consisting of the ostensibly separate companies — are so scrambled that we decline to unscramble them. We note, however, that substantive consolidation is an equitable remedy and is difficult to achieve.[7]

---

7. In addressing whether substantively to consolidate two entities in the bankruptcy context, courts have developed a number of different tests. Some have applied a seven-factor test, first set forth in *In re Vecco Construction Industries, Inc.*, 4 B.R. 407 (Bankr. E.D. Va. 1980). Those factors are: "(1) The presence or absence of consolidated financial statements; (2) The unity of interests and ownership between various corporate entities; (3) The existence of parent and intercorporate guarantees on loans; (4) The degree of difficulty in segregating and

We adopt an intentionally open-ended, equitable inquiry — which we consider one of federal common law — to

ascertaining individual assets and liabilities; (5) The existence of transfers of assets without formal observance of corporate formalities; (6) The commingling of assets and business functions; [and] (7) The profitability of consolidation at a single physical location." *Id.* at 410; *see also In re Mortgage Inv. Co.*, 111 B.R. 604, 610 (Bankr. W.D. Tex. 1990); *Holywell Corp. v. Bank of N.Y.*, 59 B.R. 340, 347 (S.D. Fla. 1986); *In re Donut Queen, Ltd.*, 41 B.R. 706, 709 (Bankr. E.D.N.Y. 1984) (all applying the *Vecco* seven-factor test).

The First Circuit, in *Pension Benefit Guarantee Corp. v. Ouimet Corp.*, 711 F.2d 1085 (1st Cir. 1983), posed five nonexclusive factors a court should consider when contemplating substantive consolidation: whether (1) the parent owns a majority of the subsidiary's stock; (2) the entities have common officers or directors; (3) the subsidiary is grossly undercapitalized; (4) the subsidiary transacts business solely with the parent; and (5) both entities disregard the legal requirements of the subsidiary as a separate corporation. *Id.* at 1093.

In *In re Augie/Restivo Baking Co.*, 860 F.2d 515 (2d Cir. 1988), the Second Circuit surveyed the caselaw and extracted two fundamental principles guiding the substantive consolidation inquiry: (1) "whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit" and (2) "whether the affairs [of the two companies] are so entangled" that consolidation will be beneficial. *Id.* at 518 (internal quotation marks omitted). The Ninth Circuit has also adopted this test. *See In re Bonham*, 229 F.3d 750, 766 (9th Cir. 2000).

The Eighth Circuit considers three factors: (1) "the necessity of consolidation due to the interrelationship among the [entities]"; (2) "whether the benefits of consolidation outweigh the harm to creditors"; and (3) "prejudice resulting from not consolidating the debtors." *In re Giller*, 962 F.2d 796, 799 (8th Cir. 1992).

Finally, the D.C. and Eleventh Circuits have adopted a two-part test. First, the proponent of consolidation must make a *prima facie* case, demonstrating: (1) that "there is substantial identity between the entities to be consolidated; and (2) [that] consolidation is necessary to avoid some harm or to realize some benefit." *Eastgroup Props. v. S. Motel Ass'n, Ltd.*, 935 F.2d 245, 249 (11th Cir. 1991); *see also In re Auto-Train*, 810 F.2d 270, 276 (D.C. Cir. 1987). The *Eastgroup* Court noted that, in making this *prima facie* case, the proponent for consolidation may want to use the *Vecco* factors or the *Ouimet* factors discussed above.

23

determine when substantively to consolidate two entities. While in the bankruptcy context the inquiry focuses primarily on financial entanglement,[8] for Title VII the focus more often rests on the degree of operational entanglement — whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another. Relevant operational factors include (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (*e.g.*, hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other. That is not to say that the considerations showing financial entanglement[9] are not relevant in Title VII cases; they assuredly are. Indeed, the line between operational and financial may be blurred (*e.g.*, when the third parties dealing with entities as one unit are creditors). However, we assume that financial entanglement will be present less frequently in Title VII cases than in bankruptcy cases and will be harder for a Title VII plaintiff to prove, given that a typical Title VII plaintiff has more limited resources and an

*Eastgroup*, 935 F.2d at 249. Once the proponent for consolidation has made this showing, "the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation." *Id.*; *see In re Auto-Train*, 810 F.2d at 276.

8. *See generally* Mary Elizabeth Kors, *Altered Egos: Deciphering Substantive Consolidation*, 49 U. Pitt. L. Rev. 381, 385 (1998) ("In cases where the disentanglement of the assets and liabilities of various entities is prohibitively expensive or even impossible, substantive consolidation may significantly increase creditor recoveries.").

9. Among them are (1) the degree of difficulty in segregating and ascertaining individual assets and liabilities, (2) the existence of transfers of assets without formal observance of corporate formalities, (3) the existence of parent and intercorporate loan guarantees, (4) whether the subsidiary is grossly undercapitalized, and (5) the existence of consolidated financial statements.

attorney who does not specialize in financial transactions.[10] Proving extensive financial entanglement will, however, bolster a Title VII plaintiff's case.

### 3. Application of Our Disjunctive Test

Under the standard just discussed, and viewing the facts in the light most favorable to Nesbit, we nonetheless hold that no reasonable jury would consider Gears and Winters a single employer under Title VII for purposes of the fifteen-employee requirement. First, there is no record evidence that Gears and Winters split themselves into separate entities to evade Title VII. Nor has Nesbit alleged that Gears and Winters hold themselves out as one entity or that they remain separate only to evade anti-discrimination laws. On the contrary, such a claim is implausible, as Vaughn Sr. assumed his ownership interests in Gears and Winters seventeen years apart, and the two companies produce different products.

Second, because Gears and Winters do not have a parent-subsidiary relationship, the second situation for combining employees (a direction from the parent to the subsidiary to discriminate) does not exist. In any event, there is no evidence that one corporation (Winters) ordered the other (Gears) to commit a Title VII discriminatory act.

Finally, Nesbit sets out no evidence — other than Gears'

---

10. Employees or prospective employees are generally not sophisticated parties and typically do not have the opportunity to conduct extensive due diligence on employers to ascertain whether they will be protected by Title VII should they accept an offer of employment. This is in contrast to the arms-length commercial transactional process by which parties often become creditors in a bankruptcy case. In that context, the parties typically urging substantive consolidation are sophisticated and have had an opportunity to conduct due diligence on the debtor in question to determine its assets, liabilities, and corporate structure, and to bargain accordingly. Thus, absent exceptional circumstances, voluntary creditors should be able to recover only from the entity with which they have bargained. *See* Christopher W. Frost, *Organizational Form, Misappropriation Risk, and the Substantive Consolidation of Corporate Groups*, 44 Hastings L.J. 449, 453 (1993) ("[U]nlike voluntary creditors, tort claimants are unable to bargain for protection against, or compensation for, the increased risk limited liability imposes.").

and Winters' common ownership — suggesting that substantive consolidation would make sense under the factors discussed. The two companies have different management. Nesbit described Randy Lau as "her boss" and conceded he was "more or less in charge" at Gears. While Vaughn Sr. fired Nesbit, we do not consider this a significant indication that Winters and Gears do not operate at arms length. Because Vaughn Sr. is president of Gears and a ten percent shareholder, it is unsurprising that he occasionally participated in Gears' management.[11] He was involved in Nesbit's termination only because Lau was unavailable on vacation when Nesbit was terminated. Added to this, there is no indication that Gears and Winters ignored corporate formalities.

That Gears and Winters coordinate in recruiting job applicants likewise does not make them a single entity under Title VII. Our outcome might be different if Gears had no say in hiring its own employees, if Gears and Winters held themselves out to job applicants as a single company, if the two companies' human resources functions were entirely integrated, and/or if they did not maintain separate payrolls and finances. However, such a situation is not present here. Moreover, there is no record evidence that third parties dealt with Gears and Winters as one unit, that Gears and Winters covered the salaries of the other's employees, or that Gears and Winters did business exclusively with each other.

In the absence of more significant operational entanglement, common ownership and *de minimis* coordination in hiring are insufficient bases to disregard the separate corporate forms of Gears and Winters. We therefore decline to view Gears and Winters as one entity for Title VII purposes. As Nesbit concedes that Gears alone employs fewer than fifteen employees, it is not an

---

11. While Vaughn Sr. is a director of both Gears and Winters, this fact does not aid Nesbit here. His directorships are likely incidental to his stock ownership, as is often the case among closely held corporations. And as discussed, the overlapping ownership and management of Gears and Winters are insufficient, without more, to warrant substantive consolidation.

"employer" under 42 U.S.C. § 2000e(b) and Nesbit's suit cannot succeed.

## III.  CONCLUSION

We hold that whether an entity employs fifteen or more workers is a merits question rather than a jurisdictional inquiry. Thus, because the District Court relied on materials external to the pleadings, it should have evaluated under the summary judgment standard Nesbit's argument for viewing Gears and Winters collectively. Even under that standard, there is no basis to view Gears and Winters together as a single employer. Because Gears alone employs fewer than fifteen employees, we affirm the District Court's dismissal of Nesbit's complaint, albeit on the merits rather than for lack of subject matter jurisdiction.

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*