**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-1698

_____

MARK VITALIS,
Appellant
v.

SUN CONSTRUCTORS, INC.; HOVENSA LLC; RICHARD LANGNER; EXCEL
GROUP, INC.

_____

APPEAL FROM THE DISTRICT COURT
FOR THE VIRGIN ISLANDS
(D.C. Civ. Action No. 05-101)
District Judge: Honorable Timothy J. Savage

_____

Argued December 6, 2011

_____

Before: FISHER, GREENAWAY, JR., and ROTH, *Circuit Judges*.

(Opinion Filed:  May 31, 2012)

_____

OPINION

_____

Lee J. Rohn, Esquire (argued)
Lee J. Rohn & Associates
1101 King Street
Christiansted, VI 00820
        *Counsel for Appellant*

David J. Cattie, Esquire (argued)
Charles E. Engeman, Esquire
Ogletree, Deakins, Nash, Smoak & Stewart

1336 Beltjen Road
Suite 201
St. Thomas, VI 00802
    *Counsel for Appellees Sun Constructors, Richard Langner and Excel Group, Inc.*

Linda J. Blair, Esquire (argued)
Bryant, Barnes, Beckstedt & Blair
1134 King Street, 2nd Floor
P.O. Box 224589
Christiansted, St. Croix, VI 00820
    *Counsel for Appellee HOVENSA LLC*


GREENAWAY, JR., *Circuit Judge*.

Mark Vitalis ("Vitalis") seeks review of several orders issued by the District Court in connection with his employment discrimination case.[1] For the reasons set forth below, we will affirm the District Court's orders in all respects.

## I.  Background

We write primarily for the benefit of the parties and recount only the essential facts.

In the fall of 2004, Vitalis was working as a carpenter for Plant Performance Services ("P2S"), a contractor performing work at the oil refinery owned and operated by HOVENSA, LLC.  He learned that Sun Constructors Inc. ("Sun") would soon be

---

[1] Vitalis's Notice of Appeal lists 18 orders and/or issues, and his concise statement of the case attached 23 orders for which he sought review.  However, his opening brief challenges only six points, set forth in detail, infra.  "It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."  United States v. Pelullo, 399 F.3d 197, 222 (3d Cir. 2005).  Therefore, we will address only the six issues discussed in Vitalis's brief.

assuming responsibility for P2S's contract with HOVENSA, and that his position with P2S would no longer exist. Should he wish to continue to work at the oil refinery, he would have to apply to Sun for a position. On December 5, 2004, the day after he was terminated from his position with P2S, Vitalis went to the Virgin Islands Department of Labor ("VIDOL") looking for vacancy postings from Sun, but there were none.[2] Having found no job vacancies posted at VIDOL, Vitalis went to Sun to speak with Richard "Doc" Langner ("Langner"), Sun's Human Resources Manager, about available vacancies. Langner told Vitalis that no positions were currently available.

On December 29, 2004, Vitalis saw a vacancy posted at VIDOL for a carpenter position with Sun. Vitalis, among others, received a referral for this position, and went to Langner to apply. Vitalis took and passed a drug test, as well as a reading test.[3] Langner hired Vitalis, and provided him with a list of tools he needed to bring with him to work. Vitalis claims that when he questioned Langner as to how he would be able to bring his tools into the refinery, Langner replied that he would check on this and get back to Vitalis. Langner asserts that he did not say anything about getting back to Vitalis, but rather assured Vitalis that he (Langner) would arrange for Vitalis to bring the tools into

---

[2] Virgin Islands law requires employers to notify VIDOL of job vacancies. VIDOL will attempt to fill the positions by referring qualified individuals who have registered with VIDOL. If no qualified individuals have registered with VIDOL, VIDOL will assist the employer by publicizing the vacancy with local labor unions, in local media, and any other means VIDOL determines to be feasible. 24 V.I.C. § 128.

[3] These tests are required for safety reasons at the refinery, since workers need to be able to read the warning signs for their protection and the protection of others.

the refinery.

On January 4, 2005, Langner called Vitalis at 7:00 a.m. to inform him that his "Right to Know" orientation would begin at 8:00 a.m. Vitalis completed the orientation, received his security badge, and reported to Langner, without any of the tools on the list. Langner fired Vitalis for not bringing his tools to work.

Vitalis filed this lawsuit, asserting claims of discrimination under 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and 10 V.I.C. §§ 1-10 & 64;[4] breach of contract to hire; and intentional infliction of emotional distress. Vitalis also seeks punitive damages against HOVENSA, Sun, Excel Group, Inc. ("Excel"), Merit Electrical and Instrumentation of Louisiana, Inc. ("Merit"), and Langner. Vitalis voluntarily dismissed the complaint against Merit.

The District Court granted HOVENSA's motion for summary judgment concluding that Vitalis failed to show that HOVENSA and Sun were joint employers, and that Sun had sole authority to hire and fire Vitalis. The District Court also granted Excel's and Langner's motions for summary judgment in their entirety, and Sun's motion for summary judgment as to the claims for intentional infliction of emotional distress and punitive damages. The remaining claims were tried to a jury. Ultimately, the jury found that Sun hired Vitalis; and that race, color, and national origin were not determinative factors in Sun's decision to terminate Vitalis. Vitalis filed a timely notice of appeal.

---

[4] The complaint cites to 10 V.I.C. § 62 et seq. However, the relevant statutory section is 10 V.I.C. § 64.

4

The six issues that are preserved for our review are whether:

1.     The District Court erroneously reframed Vitalis's claim of national origin discrimination.

2.     The District Court erred in charging the jury on causation by using an instruction on pretext rather than a mixed motive theory.

3.     The District Judge's hostility towards Vitalis's counsel, as evidenced by the District Judge's demeaning comments throughout trial, deprived Vitalis of a fair trial.

4.     The District Court erred in several of its in limine rulings.

5.     The District Court erred in denying Vitalis's discovery request regarding Sun's hiring of carpenter supervisors.

6.     The District Court erred in its summary judgment rulings when it found that: (a) HOVENSA and Sun were not joint employers; (b) Excel and Sun were not substantively consolidated; and (c) punitive damages were not warranted.

## II.  Jurisdiction

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 and 48 U.S.C. § 1612(a).  We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III.  Analysis

### A.  National Origin Discrimination

Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

5

Similarly, the Virgin Islands Code prohibits an employer from "refus[ing] to hire or employ or to bar or to discharge from employment [an] individual or to discriminate against [an] individual in compensation or in terms, conditions or privileges of employment," based on the "age, race, creed, color, national origin, place of birth, sex and/or political affiliation of any individual." 10 V.I.C. § 64(1)(a).

Vitalis argues that the District Court erroneously interpreted the federal and territorial statutes on discrimination. As a result, Vitalis claims that the District Court's rulings denied him the opportunity to argue that Sun discriminated against black West Indians based on their national origin.

In making this argument, Vitalis engages in revisionist history. Admittedly, his Second Amended Complaint alleges that he was discriminated against because he was a "black West Indian." (App. 59.) Further, his Amended Pretrial Memorandum references discrimination against "local West Indian, black workers." (App. 87.) Unfortunately for Vitalis, he did not carry these arguments through to his oral presentation to the District Court.

The trial transcript is replete with Vitalis's argument that Sun discriminated against "locals" or "local Virgin Islanders." (See, e.g., App. 932, 936, 943, 945, 958, 968.) Rarely during the pretrial and trial proceedings did Vitalis modify "local" or "local Virgin Islander" with the description of "black." In fact, the District Court did not prohibit Vitalis from alleging that black West Indians constituted a protected group based on their national origin or race. (App. 926-32.) Rather, the District Court prevented

6

Vitalis from arguing that "locals" or "local Virgin Islanders" constituted a protected group based on their race or national origin.

Our review of the District Court's legal interpretation of a statute is plenary. Parker v. Conway, 581 F.3d 198, 201 (3d Cir. 2009). "We exercise plenary review over legal questions and review factual findings for clear error." McCauley v. Univ. of the Virgin Islands, 618 F.3d 232, 239 n.7 (3d Cir. 2010).

> "National origin" usually "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." In some cases, however, courts have been willing to expand the concept of "national origin" to include claims from persons such as cajuns or serbs based upon the unique historical, political and/or social circumstances of a given region.

Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 762 n.3 (3d Cir. 2004) (quoting Espinoza v. Farah Mfg. Co., Inc., 414 U.S. 86, 88 (1973)).

Applying this definition of "national origin" to the present case, we agree with the District Court's conclusion that local residents of St. Croix do not constitute a protected class based on their national origin. No evidence demonstrated that all of the local residents of St. Croix share a "unique historical, political and/or social circumstance[]."

Vitalis's argument that the District Court should treat all "locals" as black West Indians and all "state-siders" as whites is not supported by the record. For example,

7

Labor Commissioner Cecil Benjamin testified regarding his definition of "locals."[5] He stated "How do I define locals? That's very simple. Local people, basically folks who have resided in this territory whether they're born here or not. They reside in this territory, pay taxes for a number of years, made tremendous contributions to this community. Those are locals." (App. 229.) This description may not reasonably be interpreted to imply that "locals" has a particular or sui generis focus on blacks or black West Indians. In fact, Commissioner Benjamin acknowledged that anyone could register with VIDOL, including "West Indians, Continentals, Cruzans." (App. 238.)

As the District Court observed when ruling that Commissioner Benjamin could not testify before the jury, "[h]e has made it very clear that the posting requirement is to assure that locals were given an equal opportunity to apply for jobs. And he defines locals [as] including all nationalities, color, all peoples." (App. 248.) Even Vitalis's counsel acknowledged to the Court that locals included "Virgin Islanders, regardless of race, color, national origin." (App. 969.)[6] Obviously, counsel's statements are irrelevant except to show that she has essentially conceded this point.

Additionally, evidence in the record showed that some of the state-siders are in fact black West Indians. For example, both Myron Reynolds and Kidd Joseph are black

---

[5] Commissioner Benjamin was allowed to testify before the District Court out of the presence of the jury to provide a proffer of his testimony. As discussed later, the District Court ruled to exclude Commissioner Benjamin's testimony.

[6] She qualified this broad statement by noting that "we are predominantly a black community." (App. 969.)

West Indian state-siders hired by Sun. We have found no evidence in the record to support Vitalis's claim that, since the majority of the local residents are black West Indians, all locals should be considered to be black West Indians.

Further, we have found no place in the record where Vitalis was denied the opportunity to argue that he was discriminated against because he was a black West Indian. Only when his counsel strayed from this argument into the factually unsupported references to locals, did the District Court exclude testimony or evidence, or restrict counsel's arguments. Thus, there is no basis to conclude that the District Court erred. We will affirm the District Court in its national origin discrimination ruling.

### B. Jury Instruction

In connection with his discrimination claim, Vitalis argues that the District Court erred by giving a pretext instruction rather than a mixed-motive instruction. Vitalis asks this panel to conclude that the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) overruled prior Third Circuit precedent. The Third Circuit has already ruled that Desert Palace did not eviscerate the distinction between mixed-motive and pretext employment discrimination cases. Makky v. Chertoff, 541 F.3d 205, 213-15 (3d Cir. 2008) ("A Title VII plaintiff may state a claim for discrimination under either the pretext theory set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), or the mixed-motive theory set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons.").

Since Vitalis objected to the jury instruction below, we "exercise plenary review to determine whether the instruction misstated applicable law." Collins v. Alco Parking Corp., 448 F.3d 652, 655 (3d Cir. 2006) (quoting Franklin Prescriptions, Inc. v. New York Times Co., 424 F.3d 336, 338-39 (3d Cir. 2005)).

In his proposed jury instructions, Vitalis submitted a mixed-motive jury instruction for proving causation in his Title VII claim. The Court, instead, gave a pretext (or "determinative factor") instruction based on the Model Civil Jury Instructions for the Third Circuit. As described in the model instructions, if plaintiff can "show that the defendant's activity was motivated at least in part by animus toward a protected class . . . a 'mixed-motive' instruction is warranted." Model Civil Jury Instructions 5.1.1 comment. The pretext instruction, on the other hand, requires that the plaintiff's protected status be "a *determinative* factor" in the defendant's decision. Id. at 5.1.2.

Throughout this case, Vitalis based his arguments on a pretext theory; nowhere did he argue a mixed-motive theory. He consistently argued that Sun's only reason for terminating him was due to his protected status. (See, e.g., App. 938-39.) There is no basis in the record for a mixed-motive instruction. The District Court did not err in instructing the jury on pretext only.

### C. District Judge's Hostility[7]

Vitalis argues that the District Judge exhibited bias towards him and his counsel,

thus unduly influencing the jury and depriving him of a fair trial. We find that there are no instances in which the District Judge acted improperly or in which his actions could be inferred to be improper. There is no error here.

We have determined that

> "[N]o person [may] be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." That assurance is absent-and judicial conduct improper-whenever a judge appears biased, even if she actually is not biased.

Wang v. Att'y Gen., 423 F.3d 260, 269 (3d Cir. 2005) (quoting Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980)). Essentially, "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 (1954).

We have developed a four-factor test to apply in evaluating whether or not a trial judge has violated these precepts. In United States v. Olgin, 745 F.2d 263 (3d Cir. 1984), we set out the appropriate analysis to apply in assessing the propriety of a trial judge's comments before the jury. We explained that "[t]here is no bright line separating remarks that are appropriate from remarks that may unduly influence a jury." Id. at 268. This analysis requires a balancing of the following four factors: (1) the materiality of the comment, (2) its emphatic or overbearing nature, (3) the efficacy of any curative instruction, and (4) the prejudicial effect of the comment in light of the jury instruction as

---

[7] To the extent that Vitalis attempts to obtain an advisory opinion on the recusal motion that was filed with the District Court, we decline to express any opinion on that matter.

11

a whole.  Id. at 268-69.

Vitalis points to various comments made by the District Judge during his testimony, Derrick Hanley's testimony, and Abdul Ali's testimony[8] as instances where impropriety requires reversal.  However, none of the judge's comments indicate or imply bias against Vitalis.  Although the District Judge was at times emphatic with Vitalis's counsel, he was never disparaging.  In fact, the District Judge's admonishment to all counsel that "I'm going to caution both of you now, stop the reactions to a judge, please.  It serves you poorly," displays an appropriate equanimity.  (App. 943-44.)

Given the lack of the appearance of bias in these comments, the Olgin factors are not satisfied.  There is no error.

### D.  In Limine Rulings

Vitalis argues that the District Court impermissibly converted Sun's in limine motions into motions for summary judgment.  As a result of this impermissible conversion, according to Vitalis, much of his relevant evidence was erroneously excluded.  We disagree.

In support of his argument, Vitalis attempts to conflate two distinct legal principles — summary judgment and in limine motions.  There is no support in the record

---

[8] We note that Vitalis asserts that the District Judge repeatedly interrupted his counsel during her opening statement as yet another example of the District Judge's bias. The transcript reveals that the interruptions to the opening were caused by opposing counsel, who objected repeatedly to Vitalis's counsel's opening statement.  The District Judge simply ruled on these objections.

for this argument, since the in limine motions about which Vitalis complains all involve evidentiary, rather than dispositive, issues. We are unable to engage in the mental gymnastics required to combine these principles, and will therefore address the in limine motions as exactly what they are.

We review the District Court's ruling to admit evidence for abuse of discretion. Renda v. King, 347 F.3d 550, 553 (3d Cir. 2003) ("While District Court interpretations of the Federal Rules of Evidence are subject to plenary review, rulings to admit or exclude evidence are reviewed for an abuse of discretion if they are based on a permissible interpretation of the Federal Rules of Evidence."). Under this deferential standard, we will not disturb the District Court's exercise of discretion unless there is a clear error or "no reasonable person would adopt the district court's view." Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000) (citation omitted). Unless otherwise barred, relevant evidence is admissible, and relevant evidence is any evidence that tends to make a consequential fact more or less probable. See FED. R. EVID. 401, 402 & 403.

Vitalis challenges the following in limine rulings.

1. The District Court ruled that Vitalis could not introduce evidence about per diem or other benefits received exclusively by state-side employees.[9] The District Court determined that, given its ruling regarding national origin, as well as the fact that state-

---

[9] In addition to her efforts to use "state-side" as shorthand for all white workers, Vitalis's counsel used the term "state-side" to describe employees whose main domicile was on the mainland. The District Court did not object to the use of this term as a geographic designation.

13

side employees received the per diem and benefits regardless of race, nationality, or color, any discussion of these benefits was not relevant.

2. The District Court precluded the testimony of Derrick Hanley, a carpenter at Sun. The District Court found that Mr. Hanley's testimony was not relevant to Vitalis's claim of discrimination because Mr. Hanley was fired for refusing to perform an assigned job. Specifically, Mr. Hanley refused to use a stamping machine, since using the machine was, in his mind, laborer's work and not the carpenter's work he had been hired to conduct.

3. The District Court precluded the testimony of William Barwick's use of racial epithets. Mr. Barwick was hired as a carpenter.[10] The Court determined that Mr. Barwick had no influence on the decision to fire Vitalis and, since Vitalis had made no hostile work environment claim, whether Mr. Barwick used an unfortunate epithet was not relevant.

4. The District Court precluded testimony about Excel's and HOVENSA's involvement in Sun's hiring process because summary judgment, by this point in time, had been granted in favor of Excel and HOVENSA. Given that neither company remained a party to the case, the testimony was no longer relevant.

5. The District Court precluded testimony from a group of witnesses. Vitalis

---

[10] In his affidavit, Mr. Barwick states he was hired as a carpenter. (App. 2099.) According to Vitalis's pretrial memorandum, Mr. Barwick, after being hired as a carpenter, was promoted to carpenter foreman at an unspecified time. (App. 90.)

14

challenges the exclusion of only four individuals:  Clinton Mathurin; Bertril Williams; Alfred James; and James Duparl.  Vitalis argues that there was a permissible basis for each of the witnesses to testify at trial.

When Vitalis sought to call Mr. Mathurin during trial, Sun objected based on Vitalis's failure to disclose the witness during discovery.  After offering a proffer of Mr. Mathurin's testimony, counsel for Vitalis admitted that Mr. Mathurin had not been identified previously.  (App. 451, 531.)  Based on this admitted non-disclosure, the District Court excluded Mr. Mathurin's testimony.  Similarly, counsel for Vitalis acknowledged that Mr. Williams had also not been disclosed during discovery.  Here, Vitalis argued that discovery responses would not have yielded Mr. Williams.  (App. 453-55.)  The District Court excluded his testimony based on the non-disclosure.

Counsel for Vitalis also admitted that Mr. James was not disclosed in response to the interrogatories (App. 520), and that his contact information was not provided to opposing counsel (App. 519).  Contact information for Mr. Duparl, who was identified in a deposition, similarly was never provided to opposing counsel.  (App. 528.)  The District Court excluded Mr. James and Mr. Duparl based on Vitalis's counsel's failure to provide contact information, as requested by opposing counsel.

Having carefully reviewed the record, we find no abuse of discretion in any of these decisions.

### E.  Denial of Discovery

Vitalis argues that he had "requested discovery regarding individuals whom Sun

had hired into carpenter-supervisor positions," but that Sun had refused. (Appellant's Br. 89.) The Magistrate Judge had ruled on this discovery request, finding that Sun had complied. Vitalis did not appeal that decision to the District Judge.

Sun filed an in limine motion seeking to prevent Vitalis from introducing evidence that Sun did not post vacancies with VIDOL. Sun asserted that Vitalis admitted to seeing the vacancy posting at VIDOL and that Vitalis's witness, Abdul Ali, Director of job services at VIDOL, testified during his deposition that Sun posted jobs with VIDOL. During the final pretrial conference, the District Court denied Sun's in limine motion.

Sun then informed the District Court of the existence of a letter from Mr. Ali confirming that Sun had posted 27 jobs with VIDOL in 2004 and 2005. (App. 1015.) Vitalis objected to the late disclosure of this letter and list, claiming that it should have been disclosed in response to the discovery request for carpenter-supervisor positions. (App. 1015-18.) At the hearing, Vitalis's counsel observed that "we're claiming they didn't post carpenter positions, all of these are electricians, welders, fabricators." (Id. at 1017-18.) The District Court noted that the letter could be used to impeach Mr. Ali's testimony, and that Vitalis's counsel had a preview of the impeachment evidence.

Vitalis's objection is without merit. Vitalis cannot successfully argue that the list of positions was not produced in contravention of a discovery request. The list at issue is not responsive to Vitalis's discovery request for a list of carpenter-supervisor positions. More important, the District Court constricted Sun's use of the list to impeachment only. There is no basis to conclude that the District Court's decision on the in limine motion is

16

an abuse of discretion.[11]

### *F. Summary Judgment Motions*

Vitalis challenges the District Court's decision granting summary judgment to

HOVENSA and Excel, and granting summary judgment to all defendants on the issue of

punitive damages.  Although the District Court's reasoning is difficult to discern based on

the absence of a written opinion or a transcript of a hearing, the applicable standard

remains the same.  We review the District Court's order granting summary judgment de

novo. Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010).  "To that

end, we are 'required to apply the same test the district court should have utilized

initially.'" Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176,

181 (3d Cir. 2009) (quoting Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co. of Md.,

989 F.2d 635, 637 (3d Cir.1993)).

Summary judgment is appropriate "where the pleadings, depositions, answers to

interrogatories, admissions, and affidavits show there is no genuine issue of material fact

and that the moving party is entitled to judgment as a matter of law." Azur, 601 F.3d at

216 (quoting Nicini v. Morra, 212 F.3d 798, 805-06 (3d Cir. 2000) (en banc) (citing FED.

R. CIV. P. 56(c))).[12]  To be material, a fact must have the potential to alter the outcome of

---

[11]  To the extent Vitalis challenges the Magistrate Judge's decision on the original discovery dispute, appeal from that decision is unavailable before this Court at this time because the challenge was not properly preserved.  28 U.S.C. § 636(b).

[12]  FED. R. CIV. P. 56 was revised in 2010.  The standard previously set forth in subsection (c) is now codified as subsection (a).  The language of this subsection is

the case. See Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Azur, 601 F.3d at 216. In determining whether summary judgment is warranted "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Chambers ex rel. Chambers, 587 F.3d at 181. "Further, [w]e may affirm the District Court's order granting summary judgment on any grounds supported by the record." Kossler v. Cristani, 564 F.3d 181, 186 (3d Cir. 2009) (en banc).

### i. HOVENSA

HOVENSA moved for summary judgment, arguing, inter alia, that it was never Vitalis's employer or prospective employer, and that it was not Vitalis's joint employer with Sun. Vitalis opposed the motion, claiming that HOVENSA had significant control over Sun. The District Court granted the motion, concluding that the contract upon which Vitalis relied did not cover his employment with Sun, and that the undisputed facts showed "that Sun had sole authority to hire and fire Vitalis, dictate his hours and pay, and

---

unchanged, except for "one word — genuine 'issue' bec[ame] genuine 'dispute.'" FED. R. CIV. P. 56 advisory committee's note, 2010 amend.

otherwise supervise his employment."[13] (App. 63.)

Vitalis argues that disputes as to material facts precluded the grant of summary judgment. However, there are no facts in dispute. Rather, the District Court was called upon to interpret the terms of the contract, which is a purely legal question. The terms of the contract are clear — Sun was an independent contractor and HOVENSA retained no control over any employment decisions.

In an effort to create a factual dispute, Vitalis points to § 3.4.3 of the contract. Rather than creating a factual dispute, interpreting that section, which only required Sun to submit to HOVENSA the names and qualifications of the persons filling four key positions, required legal analysis. Section 3.4.3 simply required notice from Sun to HOVENSA. The contract explicitly states "[t]he fact that such notification is required will not affect [Sun's] status as an independent contractor under this Agreement." (App. 1408.) HOVENSA possessed no control over the employment of the four individuals.

Vitalis further argues that the contract's requirement that Sun comply with applicable Virgin Islands labor laws demonstrates HOVENSA's control over Sun's employment decisions. It does not.

Assuming this contract governed the project for which Vitalis was hired, as he alleges, there is no provision in the contract indicating HOVENSA retained control over

---

[13] Section 3.4.2 of the December 22, 2003 contract provides that "[i]n performing the work, [Sun] is acting as an independent contractor and reserves the right to hire or discharge employees, designate the classification and hours of work for each employee and to supervise and control the manner of performance of the Work." (App. 1408.)

19

any of Sun's employment procedures.[14]  The District Court's grant of summary judgment on this issue will be affirmed.

## ii.  Excel

Excel moved for summary judgment on the theory that it and Sun were not an integrated enterprise.[15]  Vitalis opposed this motion, arguing that there were issues of material fact and that Excel was responsible for the actions of its subsidiary, Sun.  Both parties applied the "integrated enterprise test" in support of their arguments.  The District Court granted the motion in an order.

The Third Circuit has articulated the integrated enterprise test as including the following factors:

> We too will consider a company and its affiliates a single employer under Title VII (1) when a company has split itself into entities with less than fifteen employees intending to evade Title VII's reach or (2) when a parent company has directed the subsidiary's discriminatory act of which the plaintiff is complaining.  However, on the third part of this disjunctive test, we articulate a slightly different standard from the Seventh Circuit.  Rather than applying the test for veil piercing imported from the corporation law context (because individual shareholder liability is not implicated here), we will apply the factors courts use to determine when substantively to consolidate two or more entities in the bankruptcy context.  When courts substantively consolidate two entities, they treat the assets and liabilities of each as

---

[14] Further, Vitalis himself testified that he worked for Sun, and not HOVENSA.

[15]  Excel, Sun, and Langner sought summary judgment on other grounds, but the only decision of the District Court that Vitalis challenges in his brief is the exclusion of Excel as a party.

belonging to a single entity.

. . .

While these factors vary from circuit to circuit, the test at base seeks to determine whether two or more entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice.

. . .

We adopt an intentionally open-ended, equitable inquiry - which we consider one of federal common law - to determine when substantively to consolidate two entities. While in the bankruptcy context the inquiry focuses primarily on financial entanglement, for Title VII the focus more often rests on the degree of operational entanglement - whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another. Relevant operational factors include (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions ( e.g., hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other. That is not to say that the considerations showing financial entanglement are not relevant in Title VII cases; they assuredly are.

Nesbit v. Gears Unltd., Inc., 347 F.3d 72, 85-88 (3d Cir. 2003) (footnotes omitted).

Here, there is no evidence supporting any of these factors. Vitalis points to the common stock ownership of Excel and Sun, as well as the fact that Excel performs various administrative functions for Sun, including recruiting on the mainland. Notably, Sun pays Excel for these administrative services. There is no evidence that Excel had any influence over the hiring decisions made by Sun. To the contrary, Sun had, on more than one occasion, rejected individuals recruited by Excel for positions in St. Croix.

21

Additionally, Excel had no office on St. Croix, and Sun had no office in Louisiana. Sun had contracted directly with HOVENSA for the project for which Vitalis was hired. Excel has never contracted with HOVENSA for any project. Excel had no input on the decision to hire and fire any of Sun's employees, including Vitalis.

As we concluded in Nesbit, "[i]n the absence of more significant operational entanglement, common ownership and *de minimis* coordination in hiring are insufficient bases to disregard the separate corporate forms." Id. at 89. We will affirm the District Court's grant of summary judgment on this basis.

### iii. Punitive Damages[16]

Sun, Excel and Langner moved for summary judgment on Count V, which sought punitive damages, arguing that the acts complained of were not outrageous, or done with evil motive or reckless indifference to Vitalis's civil rights. We have recognized that district courts can determine punitive damages claims on summary judgment. See

---

[16] In his Second Amended Complaint, Vitalis sought punitive damages generally, never specifying whether he sought them under the federal or Virgin Islands statute. Federal law provides for the recovery of punitive damages "[i]n an action brought by a complaining party under [42 U.S.C.A. §§ 2000e-5 or 2000e-16] against a respondent who engaged in unlawful intentional discrimination . . . prohibited under [42 U.S.C.A. §§ 2000e-2, 2000e-3, or 2000e-16] provided that the complaining party cannot recover under section 1981 of this title." 42 U.S.C. § 1981A(a)(1). Virgin Islands law allows for "punitive damages not to exceed $5,000 to be recovered in a civil action" for violations of any provision of the Virgin Islands Civil Rights Code. 10 V.I.C. § 7. We review the summary judgment decisions de novo, "applying the same standard as the District Court." Pichler v. UNITE, 542 F.3d 380, 385 (3d Cir. 2008). A court may grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

Pichler v. UNITE, 542 F.3d 380, 387 (3d Cir. 2008) ("If, on remand, the District Court determines that summary judgment is appropriate as to plaintiffs' punitive damages claim, then a trial will be unnecessary."); Cochetti v. Desmond, 572 F.2d 102, 103 (3d Cir. 1978) ("to the claim for punitive damages, we conclude that on the record before the district court summary judgment was proper").

As a general rule, punitive damages are "reserved for special circumstances," Savarese v. Agriss, 883 F.2d 1194, 1205 (3d Cir. 1989), when "the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief" Feldman v. Phila. Hous. Auth., 43 F.3d 823, 842 (3d Cir. 1994) (quoting Cochetti, 572 F.2d at 106). In Title VII cases, punitive damages are awarded for "intentional discrimination where 'the complaining party demonstrates that the respondent engaged in . . . discriminatory practices with malice or with reckless indifference to . . . federally protected rights.'" Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 79 n.2 (3d Cir. 2009) (quoting 42 U.S.C. § 1981A(b)(1)). After reviewing the record, we agree with the District Court's decision to grant summary judgment. We find no facts demonstrating malicious or outrageous conduct, or that Sun, Excel or Langner acted with a reckless indifference to Vitalis's civil rights, or any other extraordinary conduct that would permit a reasonable jury to award punitive damages. This determination is supported by the fact that the jury here found no discriminatory conduct by the defendants, let alone discriminatory conduct that would necessitate punitive damages. Accordingly, we will affirm the District Court's grant of summary

23

judgment on the punitive damages claim.

## IV.  Conclusion

The District Court's orders will be affirmed.