LYNCH, Circuit Judge.
The Federal Emergency Management Agency (FEMA) is an agency within the Department of Homeland Security (DHS) tasked with assisting “State and local governments in carrying out their responsibilities to alleviate the suffering and damage that result from major disasters and emergencies by,” among other things, “[providing Federal assistance programs for public and private losses and needs sustained in disasters.” 44 C.F.R. § 206.3; see also 42 U.S.C. § 5174(a)(1); Exec. Order No. 12673, 54 Fed.Reg. 12,571 (Mar. 23, 1989). Pursuant to this mission, FEMA has established call centers, which primarily receive calls from those *249 affected by disasters, and National Processing Service Centers (NPSCs), which both receive calls and process claims.
Plaintiffs were employees of the now-closed Puerto Rico NPSC (PR-NPSC) run by FEMA. They filed this Title VII lawsuit alleging that FEMA’s actions in implementing a rotational staffing plan at the PR-NPSC and in eventually closing the facility discriminated against them on the basis of their Puerto Rican national origin and constituted unlawful retaliation for protected conduct. The district court granted summary judgment to defendants, finding that defendants had legitimate, nondiscriminatory reasons for their actions and, with respect to the rotational staffing plan retaliation claim, that plaintiffs had not shown a causal link between their protected conduct and the purported retaliation.
We affirm the dismissal of the case. We hold that plaintiffs’ disparate impact claims fail for two reasons. First, under our caselaw, claims of different treatment based on location absent a claim of intentional discrimination do not establish liability under 42 U.S.C. § 2000e-2(h). Plaintiffs here have expressly disavowed any claim of intentional discrimination. Second, the challenged actions were job-related and consistent'with business necessity, and plaintiffs have not shown that there were alternatives available to FEMA that would have had less disparate impact and served FEMA’s legitimate needs. Both retaliation claims fail because plaintiffs have not shown that the allegedly adverse employment actions were causally related to any protected conduct.
I. Background
We recite the facts in the light most favorable to plaintiffs. See Ramirez-Lluv-eras v. Riverctr-Merced, 759 F.3d 10, 13 (1st Cir.2014). In 1995, FEMA established a “temporary call center” in San Juan, Puerto Rico to address calls from Spanish-speaking victims of Hurricane Marilyn. The call center was located in a vacant manufacturing plant in Puerto Rico under a disaster lease and was originally designed to be only a temporary facility. Because the center “was never intended ... to serve as a longterm NPSC operation,” it “did not have many of the amenities that the agency would normally seek when establishing a long-term, fixed site facility.”
In 1998, the center began processing claims as well as receiving calls, and in 2003 it became the fourth full-fledged NPSC (the three others are in Maryland, Texas, and Virginia). The PR-NPSC was the only fully bilingual NPSC. FEMA made some limited improvements to the Puerto Rico facility when it became a NPSC, but it still lacked the “state of the art furniture and equipment” found in the other NPSCs.
In 2006, several groups of PR-NPSC employees complained to management that they were being paid less than their mainland counterparts. When no resolution was reached in their cases, plaintiffs filed with the Equal Employment Opportunity (EEO) Office an informal complaint of discrimination in October 2006 and a formal complaint of discrimination in April 2007. In May 2007, an employee filed with the EEO a class complaint on behalf of one group of employees. The class complaint was dismissed in 2008.[1]
*250 In June 2007, FEMA’s Occupational, Safety & Health Office conducted a Management Evaluation and Technical Assistance Review (METAR) of the PR-NPSC facility.[2] The METAR disclosed several “serious deficiencies,” including, for example, a lack of exit signs at several locations in the facility and the absence of “[i]nitial safety orientation training.” Several of the deficiencies were rated as “[s]ignificant risk[s] to health and safety” for which “abatement measures should be initiated within 30 days.” The management of the Puerto Rico center responded with a memorandum acknowledging receipt of the report and explaining the steps that the PR-NPSC had taken and would take to begin to rectify the deficiencies. By May 2008, management represented that it had addressed the major issues identified on the METAR save one: the construction of an egress route around the building.[3] Management was still concerned about the physical facility and particularly fire hazards.
PR-NPSC management arranged for a more specific Fire Protection and Life Safety Code review of the facility in May 2008. This review was arranged to address fire safety issues identified in the 2007 METAR in advance of the expiration of the facility’s lease in September 2008. That inspector found several problems and produced an extensive “List of Safety & Health Items to be Completed for Facility to Become Fully Acceptable.” To name just a few examples, the building did not have an automatic fire sprinkler, working fire alarms, or a sufficient number of exits. The inspector also noted that the roof of the facility could not withstand a Category 3 storm.
On May 16, 2008, Kathy Fields, the Branch Chief for NPSC Operations, notified the employees of the PR-NPSC that, “[bjecause the safety and security of our employees is our top priority, it is necessary to suspend operations at the PR-NPSC until the identified fire and life safety deficiencies are corrected.” FEMA placed its employees on administrative leave and continued paying them until July 18, 2008. The facility was not occupied from May 16, 2008, to mid-July 2008. It later resumed operations, with a limited staff.
In light of these ongoing concerns, FEMA “determined that the cost of repairing and/or relocating the facility necessitated a critical review.” Fields began considering the option of closing the PR-NPSC upon expiration of the lease. As explained in a May 19, 2008, e-mail:
[Fields’] main rationale for closure is that the Agency no longer requires the large Spanish-language capacity it is carrying at the NPSC’s. Also, the overall need for personnel at the NPSC’s has lessened. Further, to the extent Spanish-language NPSC employees are needed, this can probably be accommodated *251 at the other NPSC’s in Texas, Maryland and Virginia. Lastly, the lease for the Puerto Rico NPSC is about to expire— so that’s why she’s thinking through these issues now....
The last big Puerto Rico disaster requiring a large capacity of Spanish-language employees in the NPSC’s was Hurricane Georges in 1998.
Since that time the need for Spanish-language personnel at the NPSC’s has been steadily declining. Essentially, the Agency has been carrying a large Spanish-language capacity at the NPSC’s for some time at a level that’s greater than needed.
Fields circulated a report outlining her recommendations and her reasoning to several senior FEMA officials on May 23, 2008, as to short-term and longer-term options.[4] The report explained that the immediate repairs necessary to temporarily reoccupy the building until the end of the lease would cost $75,000, while the longer-term repairs necessary to permanently reoecupy the building would cost $525,000. These estimates did not include the cost of a new roof, which the report noted was also needed.
However, the lease on the facility would expire at the end of September 2008, unless temporarily extended. As it was, FEMA occupied the facility until February 2009. A new facility would have cost FEMA nearly $9 million up front and would have had an annual operating cost of approximately $19 million. The report concluded that, because the remainder of the NPSC system had the capacity to absorb the PR-NPSC’s workload, these potential expenses were not justified, and it was preferable to simply let the facility’s lease expire and not build a new facility. The report also included a list of options for addressing the PR-NPSC’s deficiencies that had been considered and rejected.
David Garratt, FEMA’s Deputy Assistant Administrator, the principal recipient of the report, responded to Fields that he “agree[d] with the recommendation and supporting logic.” He stated that he would forward the report to FEMA’s Deputy Administrator.
On July 15, 2008, Fields sent a memorandum to all PR-NPSC employees explaining that, based on FEMA’s review of the inspection results, FEMA had decided in the short term “to continue making repairs to the facility and,” while that was done, “to resume operations with a reduced staff sufficient to ensure readiness in the event disaster activity warrants increased staffing levels.” The memorandum announced a new staffing plan, which involved having approximately 15-20 employees (out of a total of around 300) work at a time, on a rotational basis. This rotational staffing plan, Fields explained, was “expected to continue through the end of calendar year 2008; a decision on the longer-term future of the PR-NPSC ha[d] not yet been made.” FEMA placed PR-NPSC employees who were not working on “non-duty, non-pay status effective July 19, 2008,” but volunteered to “make every effort to assist” employees who wished to transfer to one of the other NPSCs.[5]
*252 FEMA completed “[c]ritical repairs” to keep the PR-NPSC open in October 2008, which allowed the center to operate at an “expanded, but still limited capacity,” “subject to continued implementation of [certain] life safety measures.”[6] By this time, the FEMA Administrator had decided to close the PR-NPSC permanently, and so recommended to DHS. The DHS Secretary agreed on December 10, 2008, and the closure and the elimination of all positions at the PR-NPSC were announced, including to PR-NPSC employees, on December 30, 2008. In an e-mail the next day, the FEMA Administrator explained:
[W]e carefully considered all available options before making the decision to close the Puerto Rico NPSC. It was determined that this facility, originally established only to serve a temporary mission, no longer has an operational requirement. Additionally, and in view of the inadequacy of the existing facility, FEMA determined that it would not be a sound investment to repair or relocate the Puerto Rico NPSC to a new facility.
The Administrator reiterated Fields’ statement that FEMA would assist PR-NPSC employees in seeking another position within FEMA. Some PR-NPSC employees did in fact transfer to a different NPSC facility.
Another memorandum from Fields to PR-NPSC employees, dated December 30, 2008, explained the reasons for the facility’s closure in more detail. First, NPSC call volume had decreased since 2004 in light of the availability of Internet self-service options. Second, Spanish-language calls in particular had become an almost negligible portion of the NPSC workload. Third, the PR-NPSC facility was “not suitable to serve as a long-term NPSC operation” because it “was never outfitted with modern systems furniture and the supporting electrical infrastructure and some of the critical telecommunications equipment needed to support future technology upgrades.” In sum, “[t]he estimated relocation and annual operational expenses associated with a new facility [were] not justified based on historical and anticipated NPSC workload.”
II. Procedural History
Plaintiffs filed this lawsuit in October 2009, alleging that defendants engaged in discrimination on the basis of national origin and retaliation in violation of Title VII. The district court granted summary judgment to defendants on all of plaintiffs’ claims, finding, essentially, that each of defendants’ challenged actions were undertaken for non-discriminatory, valid business reasons and therefore were not unlawful under Title VII.
On appeal, plaintiffs press only their disparate impact and retaliation claims arising from two actions on the part of defendants: (a) the implementation of the rotational staffing plan during the fire-safety related work at the facility which reduced the number of days of work for each employee, and (b) the closure of the PR-NPSC. We review the district court’s *253 grant of summary judgment under Federal Rule of Civil Procedure 56 de novo, and affirm “only if the record discloses no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.” Old Republic Ins. Co. v. Stratford Ins. Co., 777 F.3d 74, 79 (1st Cir.2015) (quoting Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd’s of London, 637 F.3d 53, 56 (1st Cir.2011)) (internal quotation marks omitted). We “read[ ] the facts and draw[ ] all inferences in the light most favorable to the plaintiffs.” Ramírez-Lluveras v. Rivera-Merced, 759 F.3d 10, 19 (1st Cir.2014).
III. Analysis
A. Disparate Impact as to Rotational Staffing Plan and as to Closing
“Title VII prohibits both intentional discrimination (known as ‘disparate treatment’) as well as, in some cases; practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as ‘disparate impact’).” Ricci v. DeStefano, 557 U.S. 557, 577, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). As far as we can tell, plaintiffs have not provided record evidence showing that they are actually of Puerto Rican ancestry and origin, such as to meet the definition of members of a protected minority group under Title VII. See 29 C.F.R. § 1606.1 (defining “national origin discrimination” as including “denial of equal employment opportunity because of an individual’s, or his or her ancestor’s, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group”). That the plaintiffs simply worked for FEMA in Puerto Rico — without evidence of their membership in a protected class— would not suffice for a national origin— based disparate impact claim. See Vitalis v. Sun Constructors, Inc., 481 Fed.Appx. 718, 721 (3d Cir.2012) (noting that “ ‘locals’ or ‘local Virgin Islanders’ ” did not constitute a protected group based on national origin because “[n]o evidence demonstrated that all of the local residents of St. Croix share a ‘unique historical, political, and/or social circumstance! ]’ ” (second alteration in original)). For purposes of our analysis, however, we can assume without deciding that plaintiffs have satisfied this threshold element, as their claim fails on other grounds. Cf. Candelario Ramos v. Baxter Healthcare Corp. of P.R., 360 F.3d 53, 56 (1st Cir.2004) (proceeding on this assumption).
Plaintiffs have not pursued an intentional discrimination theory on appeal, and have expressly disavowed it. Their claim is that the discrimination was against the Puerto Rican facility in which they worked, which caused a disparate impact on the basis of national origin.
A-plaintiff proceeding under a disparate impact theory “establishes a prima facie violation by showing that an employer uses ‘a particular employment practice that causes a disparate impact on the basis of race, color, religion, , sex, or national origin.’ ” Ricci, 557 U.S. at 578, 129 S.Ct. 2658 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). If the plaintiff makes out a prima facie case, the employer “may defend against liability by demonstrating that the practice is ‘job related for the position in question and consistent with business necessity.’ ” Id. (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). And if the employer makes that showing, the plaintiff may rebut it by demonstrating “that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer’s legitimate needs.” Id. (citing *254 §§ 2000e-2(k)(1)(A)(ii) and (C)).[7]
We reject the disparate impact claim for two reasons. Defendants have established there is a legitimate business justification for the decision. And under our case law there is a logically prior disqualification of plaintiffs from making this claim. We deal first with the logically prior question.
A different provision of Title VII definitively resolves this claim in favor of the defendants at the outset. 42 U.S.C. § 2000e-2(h) provides that
[njotwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment ... to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin....
“In other words, different treatment in different locations is permissible absent an intent to discriminate.” Candelario Ramos, 360 F.3d at 61.
That safe harbor statutory provision in § 2000e-2(h) defeats both of plaintiffs’ disparate impact claims, as to the Puerto Rico employees being rotated while the facility was repaired and as to the closing of the facility after the lease expired.[8] As we said in Candelario Ramos, “[t]he subsection itself is not surprising. Location is often a proxy for differences in cost and other competitive circumstances..., ” Id. at 62. Congress acted rationally in treating this as a situation of no liability, rather than as a defense. See id.
The dissent contends that the safe harbor provision does not apply to this case because the plaintiffs’ positions were eliminated. But our decision in Candelario Ramos described § 2000e-2(h)’s application in expansive terms, making no mention of a subject-matter limitation. See 360 F.3d at 62; see also Russell v. Am. Tobacco Co., 528 F.2d 357, 362 (4th Cir.1975) (stating that the safe harbor would apply to decisions concerning promotions).
It is true that defendants did not raise the safe harbor provision in the trial court or explicitly argue it on appeal.[9] But *255 “it is settled in this circuit that ‘an appellate court has discretion, in an exceptional case, to reach virgin issues.’ ” Chestnut v. City of Lowell, 305 F.3d 18, 21 (1st Cir.2002) (en banc) (quoting United States v. La Guardia, 902 F.2d 1010, 1013 (1st Cir.1990)); see also Nat’l Ass’n of Social Workers v. Harwood, 69 F.3d 622, 627 (1st Cir.1995) (noting that the “raise-or-waive principle, though important, is a matter of discretion”); cf. Batista v. Cooperativa De Vivienda Jardines De San Ignacio, 776 F.3d 38, 42 (1st Cir.2015) (noting that “we may affirm the entry of summary judgment on any ground made manifest by the record, so long as the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law” (citations omitted)). We conclude that this ease is appropriate for the exercise of that discretion.
As our dissenting colleague agreed in his concurrence in Chestnut, the following factors inform our discretion: (1) whether the issue is purely legal, (2) whether the issue is of constitutional magnitude, (3) whether the “omitted argument [is] highly persuasive,” (4) whether consideration of the argument would prejudice the plaintiff, (5) whether the omission was inadvertent, and (6) whether the issue “implicated a matter of great public concern.” 305 F.3d at 24 (Torruella, J., concurring); see also United States v. Krynicki, 689 F.2d 289, 291-92 (1st Cir.1982).
At least four of those factors weigh in favor of our considering the safe harbor issue. First, the issue is purely legal and can be resolved on the existing record. Second, the argument that it applies is highly persuasive. Third, our consideration of the issue does not prejudice plaintiffs. Even if the safe harbor did not apply, plaintiffs’ claims would still fail because, as we explain below, defendants have set forth legitimate business justifications for their challenged actions. Finally, the issue involves important questions about the reach of Title VII that may arise in future cases. Cf. Chestnut, 305 F.3d at 24-25 (Torruella, J., concurring) (agreeing with majority’s decision to address an issue for the first time on appeal after a balancing of the foregoing factors).
As an independent holding, even if the safe harbor provision were not applicable, we would still affirm the district court’s dismissal of plaintiffs’ disparate impact claims as baseless. That is because, regardless of whether plaintiffs have made out a prima facie case of impact, defendants have presented legitimate business justifications for their actions, and there is no contrary evidence. The recent Supreme Court decision in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., — U.S. —, 135 S.Ct. 2507, 192 L.Ed.2d 514 (2015), establishes this is so. There, the Court emphasized that “disparate impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system.” Id. at 2518. It must also be limited as applied to government entities so as to avoid “injecting] racial considerations into every [agency] decision.” See id. at 2524. “Governmental or private policies are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers.” Id. (citation omitted).
Accordingly, “before rejecting a business justification ... a court must determine that a plaintiff has shown that *256 there is ‘an available alternative ... practice that has less disparate impact and serves the [entity’s] legitimate needs.’ ” Id. at 2518 (second and third alteration in original) (quoting Ricci, 557 U.S. at 578, 129 S.Ct. 2658). If employers’ business “judgments are subject to challenge without adequate safeguards, then there is a danger that potential defendants may adopt racial quotas — a circumstance that ... raises serious constitutional concerns.” Id. at 2523; see also id. (“Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas, and serious constitutional questions then could arise.”). “[P]rompt resolution of these cases is important.” Id.
With regard to the rotational staffing plan, we agree with the district court that “the rotational staffing plan served FEMA’s legitimate needs of maintaining as many employees as possible to assist in the event of a disaster” while still maintaining a safe working environment. Plaintiffs contend that the FEMA employees could have continued working in the center while the safety issues were addressed, but their disagreement does not create a triable issue that FEMA’s position resulted from Puerto Rican national origin discrimination. “[G]overnmental entities ... must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes.” Id. at 2524. The record is clear that the 2008 inspection revealed serious safety concerns, and FEMA’s decision to reduce staffing levels while addressing those concerns and evaluating the future of the PRNPSC was reasonable. Even plaintiffs’ counsel conceded that these concerns should not have been ignored. Indeed, once FEMA became aware of the problems at the PR-NPSC, it had no choice but to address them; FEMA would have been subject to an entirely different sort of legal liability had it failed to do so. And Title VII did not require FEMA to re-staff the center the minute that the majority of the safety concerns were resolved, particularly given that defendants had begun contemplating the closing of the center by that time.
Regarding the closing of the center, the undisputed facts show numerous business justifications for the conclusion that the PR-NPSC should not have remained open. For example, (1) remedying the deficiencies identified in the 2008 inspection would have been very expensive; (2) establishing and operating a new facility in Puerto Rico would have been even more expensive; (3) even though the PRNPSC employees took Spanish- and English-language calls, the Puerto Rico facility was established specifically for bilingual services, and by 2008, the volume of Spanish-language calls had decreased; and (4) the existing NPSC system could absorb the workload if the PR-NPSC closed. As defendants correctly note, FEMA had ample basis to close a facility “which still had ongoing safety issues, was in poor condition, and lacking critical modern infrastructure, and which was no longer needed, given declining claims processing needs[,] rather than to pay approximately $9 million to move to a new facility or to renew the lease and renovate the facility,” which was “never designed for long-term FEMA use.”
The report also noted that the lease on the PR-NPSC facility was set to expire in September 2008, which might be before repairs were completed. Even if, as plaintiffs contend, a lease renewal period had never prompted a facility inspection before, the fact remains that the expiration *257 of a lease is an eminently reasonable point at which to assess options for the future of a facility.
Plaintiffs, noting that the PR-NPSC employees were required to be “fully bilingual,” unlike their counterparts at other centers, suggest that defendants could have responded to the excess capacity in the NPSC system by “releas[ing] employees nationwide based on their performance.” But such a course of action would not have addressed FEMA’s concerns about the costs associated with maintaining the PR-NPSC facility. Those concerns are no less legitimate simply because the PR-NPSC was the “lowest cost of all the Centers in the nation”; FEMA still stood to realize a substantial cost savings by closing the PR-NPSC.[10] Again, this does not create a triable issue of national origin discrimination.
B. Retaliation as to Rotational Staffing Plan and as to Closing
Title VII also makes it unlawful “ ‘for employers to retaliate against persons who complain about unlawfully discriminatory practices.’ ” Ahern v. Shinseki, 629 F.3d 49, 55 (1st Cir.2010) (quoting Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir.2005)). To make out a prima facie case of retaliation, a plaintiff must' make a three-part showing: “(1) she engaged in protected activity under Title VII, (2) she suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity.” Gerald v. Univ. of P.R., 707 F.3d 7, 24 (1st Cir.2013). A “retaliation claim may be viable even if the underlying discrimination claim is not,” because “the employment activity or practice that [the plaintiff] opposed need not be a Title VII violation so long as [the plaintiff] had a reasonable belief that it was, and he communicated that belief to his employer in good faith.” See Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 174-75 (1st Cir.2003). “Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.” Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. —, 133 S.Ct. 2517, 2528, 186 L.Ed.2d 503 (2013).[11]
We hold that plaintiffs have failed to make the requisite showing that the purported adverse employment activity *258 was causally connected to any protected activity, much less that protected activity was a “but for” cause of the rotational staffing plan'or the closing of the PR-NPSC.
Plaintiffs identify two instances of protected activity which they say led to retaliation in the form of the decision to rotate employees while the center was under repair during the end of the lease period in the summer of 2008 and the decision to close the center in late 2008. The instances are (1) the EEO complaints filed from October 2006 to May 2007 claiming that PR-NPSC employees were underpaid relative to their mainland counterparts, and (2) the EEO complaints filed in response to the July 2008 implementation of the rotational staffing system.
The first set of complaints is far too temporally remote from the challenged actions to support an inference of causality. “The cases that accept mere temporal proximity between an employer’s knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be ‘very close.’ ” Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citations omitted) (noting that periods of three and four months have been held insufficient). In Breeden, the Court held that “[a]ction taken ... 20 months later suggests, by itself, no causality at all.” Id. at 274, 121 S.Ct. 1508. Here, over 14 months elapsed between the last EEO complaint regarding pay and the implementation of the rotational staffing system diming repairs. That is too long to support an inference that the complaints led to a decision to reduce staffing during fire-safety related repairs. See Shinseki, 629 F.3d at 58 (“Without some corroborating evidence suggestive of causation ... a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action.”); Morón-Barradas v. Dep’t of Educ. of Commonwealth of P.R., 488 F.3d 472, 481 (1st Cir.2007) (“[M]ore than eight months ... is [ ] insufficient to establish temporal proximity.”).
Plaintiffs argue that the “chain of events” comprising their protected activity did not end until April 2008, when “[t]he Office of Equal Rights received the [February 2008] EEOC decision” dismissing plaintiffs’ class complaint and ordering them to file individual complaints. Plaintiffs are wrong. Dismissal of an EEO complaint cannot be construed as protected activity on the part of the plaintiffs, and plaintiffs have presented no evidence that they actually filed individual complaints after the judge’s decision, or that defendants anticipated they would.
Plaintiffs suggest that there is more evidence of causation than mere temporal proximity here because defendants’ “actions ... were ... a deviation from the procedures followed within the PR-NPSC and NPSC system for over ten years.” Specifically, they assert that FEMA had never before conducted inspections of the PR-NPSC, that the conditions identified in the 2007 METAR had existed in the facility since its initial opening in 1995 but FEMA had ignored the problems, that the conditions were in fact not life-threatening, and that the 2008 fire report did not actually recommend limited occupancy or closure.
We are not persuaded. Plaintiffs point to no evidence to support their suggestion that the 2007 inspection was itself a mere pretext to eventually close the center. The record in fact suggests that FEMA management was not aware of the safety issues until they were identified in the 2007 METAR, whereupon the manage- *259 merit began taking steps to rectify the problems. The record also discloses a completely benign and logical reason for the 2008 inspection: FEMA management was concerned about the safety issues identified in the 2007 METAR.
Plaintiffs cite Harrington v. Aggregate Industries Northeast Region, Inc., 668 F.3d 25 (1st Cir.2012), where we noted that “deviations from standard procedures, the sequence of occurrences leading up to a challenged decision, and close temporal proximity between relevant events” can “give rise to an inference of pretext.” Id. at 33. But Harrington is easily distinguishable, and plaintiffs make no effort to explain why it should apply here. In finding that the plaintiff in Harrington, a whistleblower who was fired after he refused to take a drug test, had shown causation, we relied on evidence of very “close temporal proximity” (72 hours), deviations from the employer’s drug testing protocol, inconsistences in the employer’s accounts of the reasons for the drug test, and the “[e]oincidence[ ]” that the employee was singled out for a purportedly random drug test on his first day permanently back at work after his whistleblowing activities came to light. Id. at 32-34. Even there, we said the case was “close.” Id. at 34. Here, in contrast, plaintiffs cannot show temporal proximity, and the record discloses no shifting explanations for deviations from protocol or improbable “coincidences” giving rise to an inference of pretext.
The first set of complaints identified by plaintiffs occurred too early to ground a retaliation claim. The second set occurred too late and cannot be causally related. The decision to close the PR-NPSC was set in motion by recommendations in May 2008, at least two months before the implementation of the rotational staffing system, the subject of the second set of complaints. As the Supreme Court has explained, employers’ “proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.” Breeden, 532 U.S. at 272, 121 S.Ct. 1508; accord Muñoz v. Sociedad Española De Auxilio Mutuo y Beneficiencia de P.R., 671 F.3d 49, 56 (1st Cir.2012). In Breeden, the Court held that it could not infer that the plaintiff had been transferred in retaliation for filing a Title VII lawsuit when the plaintiffs employer had stated that she was considering transferring the plaintiff before the employer knew about the lawsuit. 532 U.S. at 271-72, 121 S.Ct. 1508. Here, without more evidence of causality (and plaintiffs have pointed to none), there can be no rational inference that the closure of the PR-NPSC, first contemplated in May 2008, took place in retaliation for complaints filed in the wake of the July 2008 implementation of the rotational staffing plan.
Plaintiffs suggest that we can infer a retaliatory or otherwise improper motive on the part of defendants because of a number of circumstances: (1) “[w]henever in the past there had been a reduction in the workload, FEMA would release employees nationwide based on their performance,” rather than closing an entire center; (2) even though FEMA cited budgetary concerns as a reason for closing the PR-NPSC, it was actually the cheapest NPSC to operate; (3) even though FEMA claimed that PR-NPSC was no longer needed because of a decrease in Spanish-language calls, the center also handled English-language calls; (4) FEMA did not comply with its own documented lease renewal policy with respect to the PR-NPSC, even though it did so for all other NPSC lease renewals; and (5) FEMA *260 opened a new .call center in Pasadena, California in 2012.[12]
These arguments add nothing to plaintiffs’ case. Given the safety’ concerns at the PR-NPSC facility (the existence of which plaintiffs have conceded[13]), the impending expiration of the facility’s lease, and the $9 .million cost of establishing a new Puerto Rico facility, it is not surprising that FEMA decided to close the PRNPSC in the face of reduced staffing needs.[14] While PR-NPSC employees were fully bilingual and could handle both Spanish- and English-language calls, it is undisputed that the Puerto Rico facility was originally established specifically for bilingual services, the need for which had sharply diminished by 2008.[15] While FEMA could have made different business decisions, as we have said before, “[i]n the absence of proof sufficient to create a jury issue regarding retaliation, courts should not use cases involving unsupported reprisal claims to police the wisdom, fairness, or even the rationality of an employer’s business judgments.” Mesnick v. Gen. Elec. Co., 950 F.2d 816, 829 (1st Cir.1991).
In short, we cannot conclude on this record that the rotational staffing plan or the closing of the PR-NPSC was causally related to any of plaintiffs’ protected activity. Plaintiffs’ retaliation claims fail, as well.
The premise of this entire lawsuit was erroneous. Plaintiffs cannot force a government agency to keep open an unsafe facility which would have cost excessive sums to repair when there are alternate means by which the agency can accomplish its goals. “[G]overnmental entities ... must not be prevented from achieving legitimate objectives.” Tex. Dep’t of Hous., 135 S.Ct. at 2524. What the Supreme Court said in Texas Department of Housing of the Fair Housing Act is equally true of Title VII:
Disparate-impact liability mandates the removal of artificial, arbitrary, and unnecessary barriers, not the displacement of valid governmental- policies. The [statute] is not an instrument to force [agencies] to reorder their priorities. Rather, the [statute] aims to ensure that those priorities can be achieved without *261 arbitrarily creating discriminatory effects ....
Id. at 2522 (citation omitted).
IV. Conclusion
We affirm the judgment of the district court.

. Plaintiffs state that the FEMA administrative judge overseeing the class complaint ordered certain plaintiffs "to individually re-file their [pay] claims, which they did later on.” However, plaintiffs point to no evidence that the plaintiffs did in fact re-file any claims after May 2007.

. 29 C.F.R. § 1960.25(c) requires annual inspections of federal workplaces "to ensure the identification and abatement of hazardous conditions.” The PR-NPSC had not been inspected on an annual basis between 2003 and 2007, and the record contains no explanation for this failure. There is no claim, however, that the other NPSCs have not been similarly inspected. Indeed, the Maryland NPSC was inspected in May 2008, the Virginia NPSC in June 2008, and the Texas NPSC in April 2009.

. PR-NPSC management contacted the center’s landlord regarding construction of an egress route around the facility, but the landlord responded that the building met "the minimum requirements under the [Americans With Disabilities Act] and [the landlord was] therefore not required to make these improvements.” PR-NPSC management stated in its response to the METAR that they would "request authorization and funds for this project, since it continue[d] to pose a safety issue.”

. The final decision on whether to close the center rested with the DHS Secretary, but it was the responsibility of senior FEMA officials to brief the Secretary on the issue.

. In the months following the implementation of the rotational staffing plan, several PR-NPSC employees filed EEO complaints regarding that plan, alleging that FEMA was discriminating against them on the basis of national origin. Plaintiffs assert that these complaints were filed between July 2008 and December 2008, while defendants' brief refers only to "August 2008 EEO complaints.” However, neither plaintiffs nor defendants provide a record citation to support their *252 claim about the timing of the complaints. Based on the record, it is not clear when the first complaints were filed, but an October 8, 2008, email from Kathy Fields demonstrates that over 300 complaints about the rotational staffing plan had been filed by that date. The PR-NPSC EEO specialist sent a list of questions regarding the employees' complaints to the management of the PR-NPSC in October 2008. The parties' briefs do not say whether any of these complaints were resolved prior to the filing of this lawsuit.

. The record does not reflect the terms under which FEMA continued to occupy the building after the expiration of the lease in September 2008.

. The district court held that plaintiffs had successfully made a prima facie case of disparate impact discrimination with respect to both the rotational staffing plan and the closing of the PR-NPSC facility, but that defendants’ actions were consistent with business necessity and that plaintiffs had not presented viable less discriminatory alternatives.

. Plaintiffs’ opening brief refers to a third allegedly discriminatory employment practice — the fact that there were no full-time positions at the PR-NPSC. But the brief mentions this only in passing, under a heading entitled "PR-NPSC Closure,” and that is not enough to preserve the argument. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.”). Moreover, at oral argument, the court asked plaintiffs’ counsel to specifically enumerate the challenged employment practices, and she listed only the implementation of the rotational staffing plan and the closing of the PR-NPSC, thus confirming that the plaintiffs are not pursuing an argument based 'on full-time positions on appeal. In any event, such an argument would fail in light of the safe harbor. It would also fail because, as the district court found, plaintiffs presented no record evidence of any deleterious consequences they suffered as a result of their employment classification.

.Because we find that our consideration of the safe harbor provision is appropriate in any event, we need not address whether the safe harbor is an affirmative defense or simply a congressional explanation about the substantive reach of Title VIL Cf. Candelario Ramos, 360 F.3d at 62; see generally 5 Wright & Miller, Federal Practice & Procedure § 1271 (3d ed.) (discussing the difference between *255 affirmative defenses and defenses that need not be affirmatively pleaded under Rule 8).

. Plaintiffs list several “facts” which they contend "are sufficient to establish a pattern which creates a controversy of material facts and rebuts FEMA’s proffered reasons, which were but a pretext for discrimination.” The dissent similarly focuses on the question of whether FEMA harbored a discriminatory intent and offered pretextual justifications for its actions. Plaintiffs’ and the dissent’s focus on "pretext” and on "FEMA’s intent or motive” is misguided. The proper inquiries in the disparate impact analysis are whether the challenged actions were job-related and consistent with business necessity, and, if so, whether the employer has refused to adopt an alternative employment practice that has less disparate impact and serves the employer's legitimate needs. Questions regarding “intent or motive" come into play in a disparate treatment analysis, not a disparate impact analysis. See Ricci, 557 U.S. at 577-78, 129 S.Ct. 2658; Hicks v. Johnson, 755 F.3d 738, 744 (1st Cir.2014).
In any event, we consider the facts identified by plaintiffs below, in our analysis of the retaliation claim, and find that they do not give rise to an inference' of retaliatory or otherwise improper motive on the part of FEMA.

. Once the plaintiff makes a prima facie case, "the burden swings to the defendant 'to articulate a legitimate, non-retaliatory reason for its employment decision.' ” Gerald, 707 F.3d at 24 (quoting Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir.2010)). "If a defendant can do this then the burden travels once more to the plaintiff to show that the reason is pretext and that retaliatory animus was the real motivating factor.” Id.

. At oral argument, plaintiffs’ counsel argued that, rather than closing the PR-NPSC, FEMA should have relocated it, as it did the Virginia NPSC. This argument is mentioned in only the most cursory fashion in plaintiffs' brief and is therefore waived. See Davidson v. Howe, 749 F.3d 21, 27 n. 7 (1st Cir.2014); Zannino, 895 F.2d at 17. In any event, it is not persuasive for the same reasons that the arguments regarding the other proffered evidence are not.

. Plaintiffs' counsel conceded at oral argument that the May 2008 inspection disclosed safety issues that "shouldn’t have been ignored,” but maintained that the issues should have been addressed earlier.

. The FEMA handbook, which plaintiffs cite for their contention that FEMA has a policy of uniform layoffs when staffing needs decrease, says no such thing. It simply says that when employees are released based on fluctuating staffing needs, FEMA will consider “one or more” of the following factors: "Performance,” "Job Function,” "Work Schedule Availability,” "Most Recent Hire Date,” and "Production Levels.” There is no indication that FEMA has a hard-and-fast rule that any necessary layoffs would be evenly distributed among the NPSCs.

.We also note that the California facility that plaintiffs refer to was not a NPSC, and, in any event, it opened over three years after the closing of the PR-NPSC. That FEMA opened a different type of facility in California three years after closing a NPSC in Puerto Rico that had serious fire safety issues does not raise any inference of an improper motive on FEMA's part in closing the PR-NPSC.