TORRUELLA, Circuit Judge,
dissenting.
I am once more compelled to dissent[15] because Plaintiffs-Appellants (“Plaintiffs”) have raised genuine issues of material fact that require a trial before a fact finder.
I. Background
A. The Discrimination Claims
As the majority opinion recounts, the facts of this case go back to 1995 when, in response to Hurricane Marilyn’s effects on Puerto Rico and the U.S. Virgin Islands, the Federal Emergency Management Agency (“FEMA” or “Defendants”) opened the Puerto Rico National Processing Service Center (“PR Center”), which started originally as a tele-registration center, or call center.
The scope of FEMA’s operations in the PR Center evolved over the following decade to the point that it became one of its four national claims-proeessing centers in the United States, carrying out the same duties that the other FEMA centers performed on the mainland, with the additional benefit that — its personnel being bilingual — it was able to handle calls and process claims from both English and Spanish speakers. Contrary to the majority’s assertion, it is undisputed by both Plaintiffs and Defendants that Plaintiffs are all of Puerto Rican national origin and comprise approximately ninety-eight percent of the PR Center’s workforce.
As the majority describes, when the PR Center employees realized they had been under-compensated for the same work performed by their counterparts in other FEMA centers across the United States, some employees complained to management about this situation and eventually filed complaints for equal pay before the Agency’s Equal Employment Opportunity Office (“EEOO”), alleging that by paying them less, FEMA engaged in disparate impact discrimination on the basis of their national origin. FEMA settled some of these claims in 2006. Later, another group of employees also filed formal discrimination complaints before the EEOO and requested certification as a class action.
What is striking about this second round of complaints is the curious chain of events that began only two months after these filings. In June 2007, the agency’s Occupational, Safety & Health Office performed an uncommon inspection of the PR Center’s premises. For the first time in twelve years it carried out a Management Evaluation and Technical Assistance Review (“METAR”). While multiple building deficiencies and safety needs were found in this 2007 METAR, by the time FEMA performed a follow-up building review in May 2008, most of the deficiencies had been properly addressed and corrected. In the meantime, FEMA’s Puerto Rican employees continued their battle for equal pay. The second round of discrimination complaints that had been filed shortly before the 2007 METAR were dismissed in February 2008, following a denial of class certification. Instead, the FEMA administrative judge ordered the complainants to *613 re-file their claims individually, which Plaintiffs contend that they did.
B. Procedural History
In essence, Plaintiffs’ case is that, faced with this scenario, FEMA crafted a business necessity to justify placing them in a rotational staffing plan, then closing the PR Center and ordering their termination. According to Plaintiffs, FEMA did this by inspecting the PR Center premises and issuing a list of safety concerns that allegedly required closing the center immediately for repairs, and only allowing a limited number of employees to continue to work on a rotational basis. Because FEMA had never raised concerns regarding the building’s conditions prior to that point, and the safety issues were either non-life-threatening or quickly resolved, Plaintiffs argued that FEMA should have suspended the rotational staffing plan and allowed them to return to work. In response to the rotational staffing plan, Plaintiffs also filed approximately 300 complaints. Meanwhile, FEMA did some number-crunching and came up with a reduction in operational needs for its nationwide claims processing centers that allegedly justified closing the PR Center altogether. Plaintiffs responded that this was in retaliation for their complaints over the rotational staffing plan, and that far from this representing a valid business necessity that would justify their termination, FEMA historically had released employees based on performance and not on location. They claim this could have been done by releasing employees from all centers rather than simply closing the PR Center.
In sum, Plaintiffs’ request for relief on appeal is that we remand this case so that a fact finder can decide whether their alternatives to FEMA’s business needs defeat FEMA’s justifications, and whether FEMA’s adverse actions against Plaintiffs are the result of retaliatory actions arising from their claims for equal working conditions and their requests to return to work during the rotational staffing plan. The former can be shown by establishing that Plaintiffs’ alternatives would have served FEMA’s alleged business necessity without the discriminatory impact on them or that FEMA’s justifications for both the rotational staffing plan and the PR Center closure were pretextual. The latter could be found by a reasonable jury based on the close temporal proximity of the adverse actions to the protected complaints for equal working conditions and the complaints filed in response to the rotational staffing plan. Pretext can also be inferred from Plaintiffs’ challenges to the graveness of the alleged safety deficiencies.
FEMA, on the other hand, asserts that it based its decisions on ensuring “the safety and security of [its] employees,” and the district court agreed with this by finding that there were “fire and safety deficiencies.” FEMA also justified its closure decision on the reduced needs for the PR Center within its nationwide operations.
II. Factual Controversies
A. FEMA’s Sudden Concern over Employees’ Safety
The first problem with the story that FEMA offers to support the alleged adverse actions is that, even accepting the severity of the safety concerns on which their business necessity justification was partly premised, the findings of the June 2007 METAR inspection are very similar to those of the 2008 review, and yet, the need for action (closing the center for repairs) on previously non-threatening conditions arose unexplainably in 2008. The findings were, inter alia, that a reevaluation of the fire alarm system and related emergency procedures needed to be con *614 ducted; assessment and modification of the building’s egress routes was needed; the facility did not have a hazardous communication, material, or ladder safety program; OSHA Form 300 injury log procedures and Form 301 incident report procedures were not updated; exit signs were not present at several locations throughout the facility; and internal safety orientation training was not provided. By the time the 2008 review was performed, all matters were either corrected or had a corrective plan in effect. In fact by May 21, 2008, FEMA’s own internal communications show that the “only item pending on the [2007] METAR which [had] not been solved” was the construction of a new egress route. It bears noting that this egress route had never been a concern of FEMA, as the building never had one since it was first occupied by FEMA in 1995. In fact, the egress pathway and ramp that were mentioned in the 2007 METAR were only recommended as “mid-long term recommendations.” Also, the property lease for this facility had been renewed periodically but the facility was not inspected every time it was renewed.[16] For twelve years, FEMA officers and managers visited the PR Center without ever raising any concerns about dangerous conditions on site.
Furthermore, Plaintiffs argue that the 2008 review findings that were necessary for re-occupancy of the PR Center were minimal.[17] These included conducting a fire watch in the building during occupancy, removing magnetic locks from exit doors, removing all storage in the egress corridors, updating and practicing the Occupant Emergency Plan, installing a secondary egress man-gate on the perimeter fence at the rear of the building, adding additional fire extinguishers, and obtaining fire hydrant flow test information. Crucially, the 2008 review report did not recommend closing the PR Center or reducing its capacity by implementing the rotational, staffing plan. And, by July 2008, the concerns identified in the May 2008 review— which Plaintiffs insist were not life threatening- — had already been resolved. In sum, even assuming the validity of FEMA’s business necessity to assure the safety of its employees, a jury could reasonably agree with Plaintiffs’’ compelling dispute of FEMA’s justification for denying their alternative option to the rotational staffing plan, which was to reoccupy the PR Center’s premises and continue working.
B. The Newly Discovered Reduction of Operational Needs
As the email exchanges between FEMA officials contained in the record reveal, FEMLA began looking for justifications for the permanent closure of the PR Center after the initial emergency closure for repairs on May 16, 2008, following the 2008 review. At that point, the record shows that FEMA did not possess metrics, data, or statistics showing that the PR Center was not necessary to its operations nationwide or even measuring the potential effects of its closure on the agency’s operations. What is more, some FEMA officers did not even know why the agency had come to concentrate on Puerto Rico at the time. That is, FEMA first closed the center and instituted the rotational staffing plan before it had collected the evidence to *615 come up with one of its “business necessity” justifications. Plaintiffs presented an email sent by the Deputy Administrator of FEMA on May 26, 2008, asking things like the “desired capacity and exactly how we can achieve [it] without Puerto Rico”; “[w]hat do we expect to be [our] Spanish language requirement and .what options will we have?”; “[w]ant to show that they are typically a small part of the whole system, and that the system has the capacity to absorb the Puerto Rico workload”; “[h]ow long have the facility deficiencies existed and why are we just being attentive now?”; “[h]ave there been any trends that reduce the role of the NPSC?”; “[e]an we show trends in greater usage of online?”; “[w]e need to show that we can live without Puerto Rico, even in a catastrophic situation”; and “[w]e will need to identify each of the other sites and indicate why we would not close them or reduce their capacity.” Nevertheless, the agency based its justification for the rotational staffing plan and closing the PR Center on the firm conviction that, in addition to it being a safety concern, it was no longer necessary to its operations. Indeed, the data on operational needs and statistics was only known by December 2008, when the decision to close permanently was made and after all the alleged “life-threatening” safety concerns had already been addressed. It is hard to see how the safety of the employees was still an issue by the time the data needed to support the second part of the alleged business necessity was collected.
As part of its operational justifications for the closure, once the rotational staffing system had been implemented, FEMA quantified an alleged reduction in Spanish calls. Plaintiffs contend, however, that this is irrelevant because the employees in the PR Center were bilingual and had been processing calls and claims from all across the United States for years. Furthermore, Plaintiffs argue that as of October-2008, even before the final closure of the center, FEMA already had to contract external language services.
The majority states that it agrees with the district court that the rotational staffing plan served FEMA’s needs by allowing it to have some employees in the PR Center, despite the building’s unsafe conditions, so that they could assist in a disaster scenario. This seems completely incon-gruent with FEMA’s claim that it had no operational need for the PR Center only a few months after the rotationál staffing plan began. It is nonsensical to say that the justification for closing the PR Center permanently was that FEMA did not need those employees because of reductions in operations while recognizing that FEMA had a legitimate need to maintain at least some of them in that same center to assist in the event of a disaster.
Plaintiffs also allege that, whenever FEMA faced a need for reduction in workforce in the past, it released employees nationwide based on performance. While Plaintiffs do not argue that FEMA regulations required it to do so, they claim that the agency departed from its prior practice only to discriminate against them by closing the PR Center and ordering their termination. The majority’s answer to Plaintiffs’ proposed alternative, that FEMA should have terminated employees on a national level based on performance, is a non sequitur. It claims that FEMA could not do so because it had just realized that, it had a budgetary need to close the PR Center. Plaintiffs’ argument, however, is not that FEMA could release employees across the United States based on performance while leaving the PR Center in service. What they argue is that FEMA could have closed the PR Center but transferred some Puerto Rican employees to other centers on the mainland to fill *616 spots created by releasing employees there based on performance, averting any disparate impact on Puerto Rican employees, or employees who had filed complaints concerning disparate working conditions and compensation.
Relatedly, Plaintiffs also dispute that some employees were allowed to transfer to other National Processing Service Centers because at the time the decision to permanently close the PR Center was made, they were given only twenty-four hours to decide whether they wanted to move to the mainland. Furthermore, not all were offered positions in another center and most were asked to reapply and compete for n,ew openings in those positions.
Taken together, all these facts become increasingly suspicious when considering that the employees in the PR Center had always been classified as call center employees, while their non-Puerto Rican counterparts in the mainland were classified at higher pay scales for doing the same claims-processing tasks. Over the previous two years, Puerto Rican employees had been battling FEMA over equal pay. When Program Specialists complained about the discrepancy in pay and FEMA agreed to adjust their classification, these employees were placed in the lowest step of the classification and denied increases earned as well as back pay. In addition, when the final closure decision was made, the PR Center employees had filed more than 300 complaints with the EEOO because of the rotational staffing system imposed after the initial closure following the May 2008 review.
Thus, I disagree with the majority that Plaintiffs are not entitled to have their day in court to show that FEMA’s justification to terminate them and close the PR Center based on safety concerns and the alleged reduced operational needs were simply pretextual because its true reason was to avoid the discrimination complaints brought by the Puerto Rican employees. These questions of fact are in no way foreclosed by the Supreme Court’s recent decision in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., - U.S. -, 135 S.Ct. 2507, 192 L.Ed.2d 514 (2015), as the majority implies. At a minimum, “a court must determine that a plaintiff has shown that there is ‘an alternative ... practice that has less disparate impact and serves the [entity’s] legitimate needs.’ ” Id. at 2518 (alterations in original) (quoting Ricci v. DeStefano, 557 U.S. 557, 578, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009)).
I agree with the majority that disparate impact claims must be examined cautiously to avoid interjecting racial considerations into every agency decision and to avoid causing potential defendants to establish racial quotas. Maj. Op. at 608 (citations omitted). However, there are two problems with relying on those public policy considerations to dismiss this case. First, Plaintiffs’ claims are not limited to disparate impact concerns. Indeed, they raise serious controversies of material fact regarding conspicuous acts of retaliation. Second, Plaintiffs never asked for anything close to establishing quotas to guarantee the employment of Puerto Rican employees. They present triable issues of material fact as to whether — even assuming the validity of FEMA’s justifications — their proposed non-discriminatory alternatives served FEMA’s alleged business necessity.
C. Pretext Analysis in Disparate Impact Claims
Even though Plaintiffs expressly conceded in oral argument that they do not advance any. of their claims as disparate treatment claims, this does not change the required analysis for pretext under disparate impact and retaliation. Therefore, *617 Plaintiffs should be given the chance to prove that their alternatives to FEMA’s alleged business needs defeated the same, and that the adverse actions were retaliatory. In addition, they should be allowed to establish as part of their disparate impact claims that the justifications for the adverse actions were pretextual.
In cases for disparate impact the analysis is also subject to the well-known burden-shifting standard, which allows a plaintiff to prove pretext. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (applying burden-shifting analysis for pretext in a disparate impact case); see also E.E.O.C. v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 602 (1st Cir.1995) (same); Abbott v. Fed. Forge, Inc., 912 F.2d 867, 876 (6th Cir.1990) (considering burden-shifting analysis and pretext in a disparate impact case); Bronze Shields, Inc. v. N.J. Dept. of Civil Serv., 488 F.Supp. 723, 726-27 (D.N.J.1980) (applying burden-shifting analysis and considering a 42 U.S.C. § 2000e-2(h) defense in a disparate impact claim under Griggs).
In fact, in S.S. Clerks Union, Local 1066, 48 F.3d at 601-602, we discussed extensively the applicability of the burden-shifting analysis to disparate impact claims. Having explained the requirements for a prima facie showing, we went on to state:
At that point, the defendant has several options. First, it may attack the plaintiffs proof head-on, debunking its sufficiency or attempting to rebut it by adducing countervailing evidence addressed to one or more of the three constituent strands from which the pri-ma facie case is woven, asserting, say, that no identifiable policy exists, or that the policy’s implementation produces no disparate impact, or that the plaintiffs empirical claims — such as the claim of causation — are insupportable.
Alternatively, the defendant may confess and avoid, acknowledging the legal sufficiency of the prima facie case but endeavoring to show: either that the challenged practice is job-related and consistent with business necessity, or that it fits within one or more of the explicit statutory exceptions covering bona fide seniority systems, veterans’ preferences, and the like. In all events, however, a defendant’s good faith is not a defense to a disparate impact claim.
If the defendant fails in its efforts to counter the plaintiffs prima facie case, then the factfinder is entitled — though not necessarily compelled, to enter judgment for the plaintiff. On the other hand, even if the defendant stalemates the prima facie case by elucidating a legitimate, nondiscriminatory rationale for utilizing the challenged practice, the plaintiff may still prevail if she is able to establish that the professed rationale is pretextual. The plaintiff might demonstrate, for example, that some other practice, without a similarly undesirable side effect, was available and would have served the defendant’s legitimate interest equally well. Such an exhibition constitutes competent evidence that the defendant was using the interdicted practice merely as a ‘pretext’ for discrimination.
Id. at 602 (citations and internal quotation marks omitted) (emphases added). Based on the above-cited text, FEMA’s business necessity defense is still subject to defeat if Plaintiffs can prove pretext. Thus, Plaintiffs should also be allowed to prove their pretext argument before a fact finder.[18]
*618 III. Conclusion
For the foregoing reasons, I would remand this case for trial. Plaintiffs deserved a chance to prove that their alternatives to FEMA’s adverse actions reasonably accommodated FEMA’s business necessities — to the extent that these were valid — without having a disparate impact against them, and they should have a chance to prove that the reasons given for placing them in a rotational staffing plan and then terminating them were pretextual. Specifically, a jury should decide the genuine disputes as to material fact regarding: (1) whether FEMA’s 2007 METAR inspection and the 2008 follow-up building review were causally related to Plaintiffs’ protected conduct; (2) whether the findings of these inspections support FEMA’s alleged business justifications for the rotational staffing plan and the Plaintiffs’ termination, particularly, in light of Plaintiffs’ challenges to the severity of the safety concerns and their questioning of the alleged reduction in operational needs; (3) whether the safety concerns required FEMA to close the PR Center for repairs since the record shows that these had never been a concern of FEMA, the 2007 METAR results did not require closing for repairs and having a rotational staffing plan, while almost identical findings did require so in 2008, the safety concerns had been corrected by the time the decision to permanently close the center was made, and since the only missing items, ie., the egress pathway and ramp, were only listed as “mid-long term recommendations”; (4) whether Plaintiffs’ nori-discriminatory alterna-fives to the adverse actions would not serve FEMA’s business necessities; and (5) whether FEMA’s justifications were pretextual.
For the reasons stated, I dissent..

. The majority withdrew its original opinion, Abril-Rivera v. Johnson, 795 F.3d 245 (1st Cir.2015) (withdrawn), in response to the original dissenting opinion objecting to its unusual and unjustified motu proprio raising of the so-called safe harbor defense, see 42 U.S.C. § 2000e-2(h), since excised, and as a tactic for avoiding an en banc rehearing. See 14 — 1316, Abril-Rivera v. Johnson, November 17, 2015, order withdrawing opinion.

. The lease of the PR Center property was up for renewal in September 2008, but the facility was closed temporarily on May 16, 2008, and then partially re-opened during the rotational staffing plan.

. A former FEMA Branch Chief stated that the building condition issues were “easily correctable.” The cost of the repairs was estimated to be $75,000.

. The majority .argues that this last step of the burden-shifting analysis regarding pretext *618 can be avoided in disparate impact cases because the Supreme Court left it out of its restatement of applicable law in Ricci, 557 U.S. at 578, 129 S.Ct. 2658. However, in Ricci, the Court was quoting the statute in § 2000e-2(k)(l)(a)(i), which codified the cause of action for disparate impact recognized in Griggs. That statutory text was enacted in 1991, which suggests this court was aware of it when the opinion was issued in S.S. Clerks Union, Local 1066, in 1995.